[Civ. No. 942.    Third Appellate District.—May 11, 1912.]

# JOHN P. O'CONNELL, by LAWRENCE O'CONNELL, His Guardian ad Litem, Respondent, v. UNITED RAILROADS OF SAN FRANCISCO, a Corporation, Appellant.

JURY TRIAL — SUBMISSION OF ISSUES — CODE AMENDMENTS — DUTY OF COURT — SPECIAL FINDINGS — SUPPORT OF GENERAL VERDICT — DISTINCT ISSUES.—Though since the amendment of 1909 to section 625 of the Code of Civil Procedure it is discretionary whether the court shall submit special issues to the jury in certain cases, and though, prior thereto, under the amendment of 1905, it was compulsory upon the court to submit such special issues as would have the effect to test the validity of the general verdict, yet it is the general rule, whether special issues are discretionary or compulsory, it is the duty of the court to require such answers as will support the general verdict, or, if not made, to reject that verdict. But when distinct issues are made, although the special findings upon one of them may not support the general verdict, it must nevertheless stand, if the special findings upon another distinct issue will support it.

ID.—ACTION FOR NEGLIGENCE—SUBMISSION OF DISTINCT ISSUES—DEFECTIVE TROLLEY-POLE—FAILURE TO WARN YOUNG BOY—SUPPORT OF GENERAL VERDICT.—In an action for negligence, where distinct issues were tendered and submitted as to the negligence of the defendant in maintaining a defective trolley-pole, in the use of which a young boy was injured without knowledge of the defect, and as to its distinct negligence, when placing such young and inexperienced boy in the position of trolley-tender on a construction car, in failing to warn or instruct him as to the dangerous and hazardous nature of his position, it is not material whether the special findings of the jury upon the issue as to the defective trolley-car are insufficient to support the general verdict, where it is sufficiently supported by its findings as to the failure to warn and instruct the plaintiff.

ID.—CONSTRUCTION OF COMPLAINT—FACTS STATED NECESSARILY INFERRING NEGLIGENCE IN TWO RESPECTS.—Although, if the complaint had fully charged that the injury had resulted from negligence in one respect only, it would be limited to that charge, yet, where no such limitation is made, but the complaint sets forth facts constituting negligence in two respects, leaving negligence to be inferred from the facts stated, the complaint cannot be construed as importing that the plaintiff relied any more upon the negligence to be inferred from the averments concerning the defective trolley-pole, than upon the negligence to be inferred from the averments as to the omission to instruct and warn the plaintiff as to the dangerous

and hazardous character of the work in which he was ordered to engage.

ID.—SETTLED RULE AS TO DUTY OF MASTER TO WARN INEXPERIENCED SERVANT.—The settled rule is that where the master employs a servant to do dangerous work, or to do work requiring him to handle or move about machinery of a dangerous character, who, from youth, inexperience or want of capacity, may fail to appreciate the danger surrounding him, it is a breach of duty for the master to expose such servant, even with his own consent, to such danger, or to place him in a position where it shall become necessary for him to encounter the same without first giving him such full and complete instructions as will enable him to fully and completely comprehend them and do the work safely and with proper care on the servant's part.

ID.—NATURAL SUBSERVIENCE OF MINOR TO ORDERS—CONTRIBUTORY NEGLIGENCE NOT IMPUTABLE.—A minor cannot be expected to set up his opinion, however mature, against the judgment and opinion of those maturer and older to whom he is given in charge, but he is taught the lesson of obedience from his cradle, and he is required to respect the judgment of his elders; and it would be an extreme case in which a minor would be guilty of contributory negligence in obeying the orders of one who represents the master.

ID.—MOTORMAN REPRESENTING MASTER.—Where the plaintiff was ordered by the foreman of construction, who clearly represented the master, to take the position of trolley-car tender to the motorman of a construction car, with directions to take orders from the motorman as to the manner of discharging his duties, who would show him what to do and how to do the work, it is clear that, under the circumstances thus appearing, the motorman became the agent or vice-principal of the defendant, and was not a mere fellow-servant of the plaintiff.

ID.—ABSENCE OF PREJUDICIAL ERROR IN REFUSING INSTRUCTIONS.—Where the court properly instructed the jury upon all of the material issues involved in the case, it is held that there was no prejudicial error in refusing instructions, which were either substantially embodied in the charge, or which were rendered immaterial by the special findings of the jury to the contrary, or which called for the erroneous assumption that the motorman was merely a fellow-servant of the plaintiff, and not a vice-principal.

ID.—HARMLESS EXCLUSION OF EVIDENCE—REASONABLE CARE IN SELECTION OF TROLLEY-POLE—ISSUE ELIMINATED BY FINDINGS.—It is held that there was no prejudicial error in the exclusion of evidence to show that the trolley-pole stood the advertised test of the manufacturers, regardless of the tenability of the ground on which it was excluded, since the failure of the jury to agree upon the special issue as to the defectiveness of the trolley-pole eliminated that issue

from consideration in relation to the general verdict, and left only their special finding upon the issue of failure of defendant to warn and instruct the plaintiff to be so considered.

ID.—QUESTION OF CAUSAL CONNECTION BETWEEN FAILURE TO WARN OF DANGER AND BROKEN TROLLEY-POLE.—The fact that the primary negligence found, as to the failure of the defendant to warn the plaintiff of danger, concurred as a primary and necessarily continuous cause with the broken trolley-pole in causing the injury to the plaintiff, and which precipitated the disaster, does not require that the breaking of the trolley-pole should be regarded as an independent cause, but as concurring with the original negligence to produce the disastrous result.

ID.—JUDGMENT OF INEXPERIENCED BOY AS TO FITNESS FOR POSITION NOT EXCUSING FAILURE TO WARN.—The fact that when the inexperienced boy was appointed as a trolley-tender by a vice-principal, he was asked if he thought he "could fill the job," and responded affirmatively, only tended to show that he had no realization of the hazards attending such a position, and such answer could not excuse the failure of such vice-principal to warn and instruct him as to such hazards.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.   George A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

A. A. Moore, Stanley Moore, Wm. M. Cannon, Wilder Wright, and Wm. M. Abbott, for Appellant.

Sullivan & Sullivan, and Theo. J. Roche, for Respondent.

HART, J.—This is an action for personal injuries.   The cause was tried by a jury and a verdict returned in favor of the plaintiff for the sum of $6,000, the plaintiff having asked for $30,000.

Judgment was given and entered in accordance with the terms of the verdict so returned, and this appeal is by the defendant from said judgment and the order denying it a new trial.

There is no dispute as to the circumstances under which the accident and consequent injuries to the plaintiff occurred. The principal point of controversy is whether, under the averments of the complaint, the general verdict may be sustained

in view of the failure,of the jury to return answers to certain particular questions of fact submitted to them by the court on motion of the defendant.   There are other points made on the instructions and the rulings of the court on the evidence, but the disposition of these will hinge largely upon the result reached as to the main point above referred to.

The defendant, a corporation, is engaged in the business of "running and maintaining and operating certain lines of street railway in the city and county of San Francisco over and upon certain streets" in said city, and at the time the plaintiff sustained the injuries complained of, and from time to time prior thereto, was engaged in constructing, altering and repairing certain portions of its railway system.   For that purpose it operated, by means of electricity and trolley-poles, cars for carrying dirt from certain points on its said lines of railway to other points on said lines.

It appears that in the year 1902, when the plaintiff was a lad of about the age of fourteen years, he left school for the purpose of seeking and procuring work, and that he was given employment by the defendant.   At first he was put to work carrying and distributing drinking water to and among the workmen engaged in construction work on the defendant's railway lines.   He performed this service for a period of about six months, when the defendant put him to work as a messenger, whose duties were to carry letters and requests for tools between the construction points and the railroad office. In the last-mentioned capacity he acted for about six months, having then been continuously in the employment of the company for about a year.   He was discharged from the service of the company in May, 1903.   Up to this time the plaintiff had never had any experience with or in the use of machinery of any kind or character, and had no knowledge of the manner of manipulating cars operated by electricity, nor did he know anything about the appliances or machinery by means of which such cars are operated.

After his discharge from the service of the defendant, he obtained employment with the Key Route Railway Company in Oakland.   While employed with that company he was put to "drilling holes in rails with a ratchet for the purpose of putting in bond wires between the rails."   He continued in the service of the Key Route Company for about six months,

when he secured employment involving the performance of similar duties with the Belt Railroad in the city of San Francisco, remaining with the latter until August 7, 1903, on which date he was again given employment by the defendant as a carrier of drinking water, as the same was required from time to time, to the laborers employed in construction work for the defendant. He was thus employed up to the noon hour of that day, after which, and on the same day, one Montague Graham, then general foreman of construction for the defendant, ordered him to take the position of "trolley-tender" on one of the construction cars, and, in obedience to the order so given, he boarded said car and proceeded to discharge the duties of the position to which he was thus assigned. Prior and up to the time he was put to work on said car as trolley-tender, the plaintiff was still without experience in the use or manipulation of trolley-poles and possessed no knowledge of the manner of handling the mechanical appliances ordinarily employed in propelling cars operated by electricity by the trolley system.

The car upon which he was assigned to duty was then in charge of one Kleupfer, the motorman, it being shown and admitted that construction cars were always in control of the motormen and that the trolley-tenders were subject to the orders of the former.

The plaintiff made several trips on the car prior to the time at which the accident occurred. It appears that the car was engaged in hauling dirt to a point on the defendant's railway system in the neighborhood of Golden Gate Park. Just before the accident, the car was standing on a bridge, where the dirt was being dumped from the car. There was but one track on the bridge. At either end of the bridge two tracks merged into the single track on the bridge. While the dirt from the car was being dumped therefrom on the afternoon of the eighth day of August—the day succeeding that on which the plaintiff was inducted into the position of trolley-tender—two passenger cars, coming in opposite directions, approached either end of the bridge. It was the duty of the construction car to clear the track to enable the passenger cars to pass over the bridge, and in order to do this, the motorman first ran his car to the south side of the bridge to let the north-bound car cross, after which he started across

the bridge to the north side thereof to let the south-bound car cross. After the north-bound car had passed, the plaintiff jumped from the work-car to the ground for the purpose of switching the trolley, and as he was in the act of doing so, the motorman ordered him to jump on the "bumper" of the car. The plaintiff obeyed this order, took a position on the "bumper" in the front end of the car, and put the trolley back on the wire. The car then started across the bridge, the trolley being in the wrong direction. While the car was in motion and still on the bridge, the motorman, so the plaintiff testified, ordered him to "pull down the trolley," and, in pursuance of the order so given, he started to pull the trolley down, when the trolley pole snapped about a foot from its base, with the result that plaintiff lost his balance, fell to the ground in front of the car and received the injuries for which he is seeking damages through this action. The body of the plaintiff was jammed under the car in such manner as to require the use of a "jack" to raise the car in order to extricate him from his position. He sustained a number of bodily injuries, the most serious of which were a fractured leg, the break extending obliquely from a point just above the knee to a point on the thigh, a cut on the back part of his head and a broken nose. He was confined to a hospital for over three months, the injured leg was left somewhat shorter than the other, the muscles on the outside of the foot had become atrophied and entirely lost their power, and the physician testified that the plaintiff would always suffer more or less pain from the injury to that limb.

The plaintiff testified that, when ordered by Graham to take the position of trolley-tender, the latter made no inquiry of him as to whether he (plaintiff) had ever had any experience in that line of employment; that Graham did not explain to him at that or at any other time the character of the duties he was thus required to perform, nor did he warn plaintiff of any dangers that might be involved in the discharge of those duties.

Kleupfer, the motorman, testified that, previously to the assignment of the plaintiff to the performance of the duties of trolley-tender, he said to Graham that he "would like to have a man tend this trolley, somebody that knows the wires and switches," as he could not do anything with the man who

was then acting in that capacity. "With that," continued Kleupfer, "he [Graham] sent a boy over to me, and I looked at the boy [referring to plaintiff] when he climbed on the car, and I said, 'Mr. Graham, I don't want this boy. Can't you give me a man? . . . ' He said: 'He knew all about the switches and the trolley, and is well enough versed; he has worked for the company before.' I said: 'I would like to have a man, because I don't know what will happen to this lad,' and he said, 'Go on and take him,' and I took the boy on the car and went away."

Graham, testifying for the defendant, admitted that, previously to putting the plaintiff to work as a "trolley-tender," he did not ask the boy whether he had ever acted in that capacity before, or whether he had ever had any experience in or with the operation of a car. He admitted that he did not even know the extent of Kleupfer's experience as a motorman, or what Kleupfer's ability was as a motorman, although, he testified, all that he said to the plaintiff when ordering him to take the position of conductor or "trolley-tender" was that the motorman would tell him what to do, and where to go, and what switches to take. Graham further admitted that at no time did he explain to the plaintiff that there was any danger involved in the performance of the duties of a "trolley-tender," or give plaintiff any warning that the trolley might fall or be pulled down. And upon this point the plaintiff testified that the motorman, prior to the accident, gave him no instructions as to his duties with the exception of telling him how to open and close the switches and to adjust the trolley to the wire; that he did not at any time warn the plaintiff of the dangerous character of the work to which he (plaintiff) had been assigned by Graham. There was evidence received to the effect that, when the plaintiff entered upon the discharge of the duties of "trolley-tender," the trolley-pole was in a defective condition, and that plaintiff had discovered and knew that the pole was bent or not in perfect condition after he had operated it for a short time.

As previously stated, there is practically no disagreement between counsel with respect to the circumstances under which the plaintiff was put to work as a conductor on the work-car or of the circumstances attending the accident. But

we have given a brief *résumé* of the facts as developed by the evidence in order to facilitate a clear apprehension of the principal point urged here against the soundness of the general verdict.

But, to obtain a clear understanding of the main proposition contended for by the defendant with reference to the issues tendered by the complaint, it will also be necessary and at this time the more orderly to refer to and reproduce some of the averments of plaintiff's pleading.

Paragraph 7 of the complaint charges that the plaintiff, while employed as a messenger boy by the defendant, was ordered and directed by the latter to board the construction car heretofore referred to for the purpose of acting as conductor thereon, and that he was ordered and directed by the defendant, while so acting as conductor, to obey all orders given him by the motorman in charge of said car.

Paragraph 8 alleges that the trolley-pole used on said car was, at the time the plaintiff was put to work as indicated, defective and out of repair, and that such condition of said pole was known to the defendant, "or, in the exercise of reasonable care, would have become known to said defendant, and was unknown to plaintiff."

Paragraphs 10, 11, 12 and 13 read as follows:

"X.   That at the time said plaintiff was given said instruction last. aforesaid, said work which plaintiff was instructed to do was dangerous and hazardous, all of which was known to said defendant and unknown to said plaintiff.

"XI.   That at all of said times said plaintiff was unfamiliar with and inexperienced in the operation of said cars and the handling of said trolley-poles, and at all of said times was unaware of the dangerous and hazardous character of the work which he was ordered to do, all of which was known to said defendant.

"XII.   That pursuant to said order aforesaid, and while said car was proceeding in a northerly direction as aforesaid, and under the circumstances aforesaid, said trolley-pole was pulled down by plaintiff, by means of said rope, for the purpose of switching it from said overhead wire, with which it was in contact, to said other wire.   That as plaintiff pulled said trolley-pole as aforesaid, by means of which said rope, below said wire, with which said trolley was in contact, said

trolley-pole, *by reason of its being out of repair, and by reason of its being in a defective condition, suddenly broke, thereby causing plaintiff to lose his balance and fall from the place where he was standing, to wit, on said bumper located on the front of said car, to the ground.*

"XIII.   Then and there, by reason of plaintiff's fall to the ground in front of said car, said car (then in motion) came into violent collision with plaintiff, and ran over him, then and there inflicting upon him the following injuries."

The complaint, as counsel for plaintiff contend, proceeds upon the theory that the defendant was guilty of two different and distinct acts of negligence, upon either of which, singly, or both operating concurrently to produce the injuries complained of, a recovery may be predicated.

On the other hand, the defendant first contends that (to use the language of its counsel) "although it is stated in paragraphs 10 and 11 of the complaint that this work which the plaintiff had been instructed to do was dangerous and hazardous, which was known to the defendant, but unknown to the plaintiff, and that the plaintiff had never been warned nor instructed concerning this danger, but was inexperienced in the operation of cars, and the knowledge of trolley-poles, and unaware of the dangerous character of the work, all of which was known to the defendant, the plaintiff cannot recover on the basis of any of these allegations *because it is not stated in the complaint that any of these matters caused or were responsible for the injuries received by the plaintiff.* Having alleged what caused his injuries, the plaintiff is limited to that basis of recovery; having stated that he was injured by reason of the trolley-pole being out of repair and in a defective condition, and not having alleged that he was injured by reason of any other act or omission, he cannot predicate liability on any such act or omission, but is confined to the one theory that the defective condition of the trolley-pole was the cause of his injuries, and his recovery must be based solely upon that ground."

The court submitted to the jury a number of special questions of fact involved in the issue of negligence attributed to the alleged omission of the defendant to maintain a trolley-pole in perfectly sound and safe condition, and likewise submitted a number of particular questions of fact involved in

the alleged act of negligence of the defendant in failing to
properly instruct and warn the plaintiff that the duties to
which it had assigned him were dangerous and hazardous.

The jury returned affirmative answers to the questions
whether the trolley-pole was out of repair at the time of the
accident to plaintiff and whether, at the same time, such con-
dition of said pole was known to plaintiff.   Upon the several
other questions relating to the condition of the pole, calling
for a direct decision of the propositions whether the pole was
defective, whether such condition was known to the defend-
ant at the time of the accident, and whether the defendant,
by the exercise of reasonable care, could have known of the
condition of the pole as found by the jury, the jury could
not agree, or, to be more explicit, the three-fourths of the num-
ber of the jury requisite to form and return answers could
not agree upon responses to said questions and so reported to
the court.

It is therefore contended by the defendant that the jury
having thus failed to return answers to the particular ques-
tions of fact involved in what it conceives to be the only and
single issue of negligence submitted by the complaint, such
failure was tantamount to a failure of the jury to agree upon
the general verdict.   In other words, it is the contention that
the negligence alleged in paragraph 12 of the complaint being
the only negligence upon which the plaintiff relies for a re-
covery, unless such negligence was proved, the general verdict
could not stand, and that the failure of the jury to answer
the particular questions of fact involved in that issue of neg-
ligence proved that the jury could not agree upon the facts
essential to the support of the general verdict.   Under these
circumstances, it is further urged, it was the duty of the
court not to accept the general verdict.

At the time of the trial of this action, under the terms of
section 625 of the Code of Civil Procedure, as said section
was amended by the legislature of 1909 (Stats. 1909, p. 193),
it rested, as it does now, entirely in the discretion of the
trial court whether particular questions of fact should be sub-
mitted to the jury in certain classes of cases.   Prior to said
amendment and under an amendment of said section by the
legislature of 1905 (Stats. 1905, p. 56), it was compulsory
upon the court to submit such questions to the jury where

they were requested and so framed as that answers thereto would have the effect of testing the validity of the general verdict—that is to say, of determining whether all the facts essential to the support of the general verdict were established to the satisfaction of the jury by the evidence.  But it is no doubt the settled rule that where the court submits such particular questions to the jury, and they in form and substance comply with the conditions laid down by the chief justice in *Plyler* v. *Pacific etc. Cement Co.,* 152 Cal. 125, 134, [92 Pac. 56], it is as well the duty of the court where the matter of the submission of such questions rests solely in its discretion as it is or would be where such submission is compulsory to require answers to such questions or, if the jury cannot agree upon answers thereto, to refuse to accept the general verdict.   (See *Stein* v. *United Railroads,* 159 Cal. 379, [113 Pac. 663] ; Clementson on Special Verdicts, p. 107.) And it is, of course, very evident that if, as in the Stein case, *supra,* the unanswered questions above referred to called for answers as to facts without the proof of which the plaintiff could not support his action or a recovery, the effect of the failure by the jury to answer said questions would be to vitiate the general verdict.

We are, however, not in accord with the defendant's construction of the complaint or of the scope and effect of the averments thereof, or, in other words, with its conception of the theory as to negligence upon which the complaint has proceeded, and are, therefore, of the opinion that the failure of the jury to return replies to the particular questions bearing upon the issue as to the defective condition of the trolley-pole cannot justly be held to constitute or amount to a disagreement by the jury upon the general verdict.   In other words, we do not assent to the proposition as contended for by the defendant that the plaintiff has, in his pleading, predicated his claim to relief solely upon the negligence involved in the alleged act of the defendant in suffering the trolley-pole to be and to remain in a defective condition.   Indeed, scrutinizing that pleading in its entirety and viewing and construing the charging parts of its allegations together and as a whole, it cannot, with reason, be held that the plaintiff relies any more upon the negligence to be inferred from the averments concerning the defective condition of the pole than upon the

negligence implied from the averments as to the omission of the defendant to instruct and warn the plaintiff respecting the dangerous and hazardous character of the work in which he was ordered by the defendant to engage.  It will readily be perceived that neither the averments involving the charge that the pole was defective and out of repair nor those setting out the failure of the defendant to warn the plaintiff of the dangerous character of the duties imposed upon him *directly* charge negligence.  As to the alleged defectiveness of the trolley-pole, the complaint, it will be noted, merely avers that "said trolley-pole, by reason of its being in a defective condition, suddenly broke, thereby causing the plaintiff to lose his balance and fall from the place where he was standing," etc.  This averment could and perhaps did speak the truth— that is, that plaintiff fell to the ground and sustained his injuries by the breaking of a defective trolley-pole—yet it cannot in any degree impair or detract from the force of the averment from which it is to be inferred that the defendant was primarily at fault by its failure to do the very first duty it owed to the plaintiff, viz.: to warn him of the fact, of which it possessed knowledge, that the work which it had directed him to perform was usually attended by hazard and danger to him who performed it.  It may be suggested that, if the complaint had directly charged that the *injuries* to plaintiff were proximately occasioned by the *negligence* of the defendant in maintaining the defective trolley-pole and no special or direct charge of negligence were alleged in connection with the averment that the defendant omitted to warn the plaintiff of the dangerous character of the duties to which it had assigned him, then, perhaps, some ground for the defendant's position might exist and a different question might, consequently, confront us.  But, as we have shown, the complaint nowhere by direct language specifically charges negligence to the defendant, but relies solely upon a description of certain acts from either of which negligence must necessarily be inferred.  It must be kept in mind that this is not one of those cases in which the question arises as to which of two distinct causes, produced by two separate persons, proximately occasioned the injuries.  The two alleged wrongful acts here are laid at the door of the same person.  It can make no difference which of those acts caused the injuries, or whether both, operating

together, caused them.   The result is the same, so far as fixing the liability upon the defendant is concerned.   And clearly neither of said acts rests or is dependent upon the other for the statement of a case of culpable negligence.

The real and only issues tendered by the complaint, then, are: Did the plaintiff receive the injuries as alleged in the complaint?   If so, was it by and through the negligence of the defendant that such injuries were proximately produced?

Manifestly, it was for the jury to decide these issues, and it was within their right and province under the issues as thus submitted, having found that the injuries had been received, to determine from the evidence whether the negligence of the defendant in producing them was in the alleged act of maintaining a defective trolley-pole or in its alleged failure to properly or at all warn and instruct the plaintiff as to the danger and hazard lurking in the duties which it required him to perform and in the execution of which he sustained such injuries, or in both the alleged wrongful acts operating together.   It follows, therefore, that, although the jury might have conceived themselves justified by the evidence in acquitting the defendant of culpability as to the matter of the alleged defective trolley-pole, still they were authorized, if the evidence warranted such conclusion, in basing their verdict upon the negligence of the defendant in omitting to warn and instruct the plaintiff as to the hazards of the undertaking which it had directed him to assume.   And this, it is clearly manifest from the general verdict and the answers returned to certain of the particular questions of fact submitted to them, is precisely what the jury did.

We have already seen that the jury could not agree upon responses to some of the essentially material particular questions of fact involved in the issue as to the alleged defect in the trolley-pole.   But, as before stated, they did agree upon and return answers to all the particular questions involved in the issue as to the negligence of the defendant in failing to instruct the plaintiff that the duties of trolley-tender involved hazard and danger to an inexperienced person undertaking to discharge them.   The answers so given involved express findings by the jury of these facts: That the defendant, as alleged in the complaint, ordered the plaintiff to take the position of conductor on one of its work-cars; that the

plaintiff was ordered by the defendant while on said car to obey all orders given by the motorman in charge of said car; that a short time before the accident the said motorman directed plaintiff to stand upon the bumper of said car and that the danger of plaintiff's position on the bumper was not obvious to a person of his age, experience and capacity; that the work of trolley-tender upon the car upon which plaintiff was put to work was dangerous and hazardous; that the danger of such employment was unknown to plaintiff; that, before the accident, plaintiff was not given by the defendant sufficient instructions with regard to the performance of his duties as trolley-tender; that, prior to the accident, the defendant did not warn the plaintiff concerning the danger or hazard of his work as trolley-tender; that at the time of the accident, the plaintiff was unfamiliar with, and inexperienced in, the operation of said car; that at that time plaintiff was unfamiliar with, and inexperienced in, the handling of said trolley-pole; that the plaintiff, at the time of the accident, was not aware of the danger and hazard involved in the work which he was engaged in at that time.   These findings, when considered in connection with the failure of the jury to return express findings upon the other issue of negligence made by the complaint, clearly show this: That, while reaching the conclusion that the fact of plaintiff's admitted knowledge of the defective condition of the pole constituted contributory negligence, or, perhaps, more strictly, an assumption of risk on his part upon that issue, and that, therefore, the defendant should be held blameless for consequences flowing from the defectiveness of the pole, the jury were, nevertheless, satisfied from the evidence that the defendant negligently failed to instruct and warn the plaintiff—a mere boy, having no previous experience whatsoever in such employment—as to the hazardous nature of the duties which it had thus imposed upon him, and that, by reason of such negligence on the part of the defendant, the plaintiff was injured.   And it cannot for a moment be doubted that the general verdict is consistent with and supported by the findings last referred to and that, as before shown, the attitude of the jury on the other issue of negligence, as evidenced by its report to the court on the particular questions submitted to them thereon, does not con-

flict with nor in any manner or measure invalidate the general verdict.

It will, of course, not be disputed that the settled rule is that, where the master employs a servant to do dangerous work or to do work necessarily requiring him to handle or move about machinery of a dangerous character, "who, from youth, inexperience, ignorance or want of capacity, may fail to appreciate the danger surrounding him, at such work, it is a breach of duty for the master to expose such servant, *even with his own consent*, to such danger, or to place him in a position where it shall become necessary for him to encounter the same without first giving him such full and complete instructions as will enable him to fully and completely comprehend them, and to do the work safely, and with proper care on the servant's part." (From an instruction approved in *Clark* v. *Tulare Lake Dredging Co.*, 14 Cal. App. 439, [112 Pac. 564], and founded upon the rule as laid down in *Foley* v. *California Horseshoeing Co.*, 115 Cal. 184, [56 Am. St. Rep. 87, 47 Pac. 42].)

In the last-mentioned case the court points out certain conditions upon which a minor, employed about dangerous machinery, may himself be held responsible for any accident and consequent injury that might happen to him while engaged about or in operating such machinery, but, on the other hand, it unreservedly approves the general rule as to the employment of minors as it is thus enunciated in *Turner* v. *Norfolk etc. Ry. Co.*, 40 W. Va. 675, [22 S. E. 83] : "A minor cannot be expected to set up his opinion, however mature, against the judgment and experience of those maturer and older to whom he is given in charge, but he is taught the lesson of obedience from his cradle, and he is required to respect the commands and to pay deference to the judgment of his elders, until legally emancipated at the age of twenty-one years. And it would be an extreme case in which a minor should be guilty of contributory negligence in obeying the orders of his foreman, representing his master."

The brief reference we have made to the evidence is, we think, sufficient to disclose that the case here comes clearly within the doctrine invoked and applied in the cases above cited. Here we have a lad scarcely beyond the age of four-teen years, who, when called to the employment in the execu-

tion of which he was injured, was acting as a mere messenger
boy, without the slightest experience in the manipulation of
the mechanical appliances usually used in the operation of
trolley-cars, and, without warning or instruction as to the
character or hazard of such employment by the defendant or
its agent, put to work as a trolley-tender, and thus compelled
to assume the responsibility of performing duties as to the
performance of which, we are justified in saying, even an
adult, for his own protection as well as that of the public,
should first be given specific, clear and definite instructions
before he should be permitted to assume the responsibility of
performing them. But, whether because of youth, inexperi-
ence and ignorance, the plaintiff was altogether unfitted for
the performance of such duties and unable to realize or ap-
preciate the danger or hazard involved therein, and whether,
under all the circumstances appearing, the defendant was
guilty of that remissness, in the discharge of the duty it owed
to the plaintiff, censurable in law, by failing to instruct the
latter how to perform the duties to which it had assigned him
and to warn him as to the hazards involved therein before
he was put upon their performance, constituted questions
whose solution was peculiarly a matter for the jury, and, as
previously stated, we perceive no reason for doubting that
upon that issue alone the jury founded their verdict and that
their conclusion as thus expressed and as evidenced by their
answers to the particular questions of fact involved in said
issue, is amply supported by the proofs.

The defendant complains of a number of errors, which it
claims were prejudicial to its rights, in the action of the court
involving its charge to the jury. It will not be necessary to
give all these assignments special notice. It may be remarked
generally that the court instructed the jury clearly and fully
upon all the issues upon which enlightenment as to principles
of law pertinent thereto was essential to a just determination
of the case as made by the pleadings and proof.

What we have heretofore had to say concerning the issues
as to negligence tendered by the complaint is substantially a
reply to the contention that the general verdict is against
law because it is in conflict with instruction No. 32, given by
the court at the request of the defendant, and declaring that
the defendant would not be liable for any injury suffered by

the plaintiff by reason of the defective condition of the trolley if, finding said pole to be defective and out of repair, the defendant, at the time of the accident, did not know and, by the exercise of reasonable care, could not have discovered such condition of said pole. We need not, therefore, give the point thus advanced further consideration.

The above observation is equally pertinent to instructions Nos. 3 and 10, submitted to the jury on the motion of the plaintiff, the questions involved therein having already been examined and decided against the contention of the defendant with regard thereto. The first of these instructions merely announced to the jury that the plaintiff, in his complaint, relies, as to negligence, upon two separate and distinct theories. This we have held to be true, and, therefore, the second of said instructions pertinently and, we may add, correctly declared to the jury the rule as to the duty of the master toward his servant, where the latter is required or directed by the former to perform duties of a dangerous character or in a dangerous place, and such servant, from youth, inexperience, ignorance or want of general capacity, may fail to appreciate the dangers of such duties or place.

Error is further predicated upon the court's refusal to allow some of the defendant's instructions, among which is instruction No. 50, which reads as follows: "Even if you find that the defendant was negligent, such negligence was not the proximate cause of the injury, unless the defendant, in the exercise of ordinary care, ought reasonably to have foreseen that injury might result therefrom, or unless such injury was the natural and probable consequence of the master's negligence." This instruction is so general in form that it is difficult to say to which theory of negligence relied on in the complaint it was intended that it should apply. If, however, it was addressed to the alleged negligence involved in the act of maintaining a defective trolley-pole, the reply to the exceptions to the court's action in refusing it is twofold: 1. That the court, in its charge, fully covered the law as to such alleged negligence; 2. That, even if it were error to disallow it, the error is without prejudice, since the jury practically found in favor of the defendant on the issue of negligence as to the trolley-pole, or, at any rate, eliminated that theory of negligence as an issue in the case by their failure

to return answers to the particular questions of fact involved therein. If, on the other hand, the instruction was designed to bear upon the other theory of negligence, the failure to allow it was also without prejudice in view of the full exposition of the law upon that question embodied in the court's charge.

Instruction No. 51, relating to the issue as to the condition of the trolley-pole, proposed by the defendant, was rejected, and the action of the court in that respect, even if erroneous, which we do not decide, turned out to be without prejudice, because (as suggested in the above observations on defendant's proposed instruction No. 50) the issue to which it was addressed became immaterial by reason of the action of the jury thereon. (*Lightner Mining Co.* v. *Lane et al.,* 161 Cal. 689, [120 Pac. 771] ; *Lowe* v. *San Francisco etc. Ry. Co.,* 154 Cal. 573, 578, [98 Pac. 678].)

It is next contended that the court erred in declining to allow certain instructions, proposed by the defendant, on the subject of negligence of a fellow-servant. The court was, in our opinion, justified in rejecting said instructions. While the answer, as one of the defenses, pleads that the injuries of the plaintiff were occasioned solely through the negligence of a fellow-servant, there was not offered by the defendant, nor is there in the record, any evidence supporting that defense. The undisputed evidence, on the contrary, shows that the plaintiff was ordered by the general foreman of construction of the defendant to take the position of conductor or trolley-tender on one of its work or construction cars; that said car was in the immediate control of the motorman, and that the foreman of construction directed the plaintiff to take orders as to the manner of discharging his duties as trolley-tender from the motorman, saying to plaintiff that the former would show him what to do and how to do the work to which he was assigned. It is very clear from these facts that the motorman, in his relation to the plaintiff as an employee of the defendant, was more than a mere fellow-servant in the sense that an employer is not legally liable for injuries sustained by one servant through the negligence of a fellow-servant. Under the circumstances as revealed by the evidence, he was the agent of the defendant or its vice-principal.

It may be said to be true that, in a general sense, or generally speaking, the motorman and conductor of an electric work-car are fellow-servants, but the books are full of cases showing. where one fellow-servant, in the discharge of a particular duty for his employer, may become, by reason of the peculiar nature of such duty, the master's agent so as to bind the latter for any damage resulting from its negligent execution. The rule is that where the master owes a duty to his employee he cannot escape responsibility for its proper performance, or liability for an injury to one servant occasioned by a failure to perform such duty, by delegating its performance to another servant. (*Tedford* v. *Los Angeles Elec. Co.*, 134 Cal. 79, [54 L. R. A. 85, 66 Pac. 76].) It is said in that case "that the fellow-servant to whom the performance of such duties is assigned becomes, with respect to that particular duty, the special representative of the employer—sometimes called a vice-principal. In such case negligence of the servant is the negligence of the principal, for which the latter must answer. (See *Daves* v. *Southern Pac. Co.*, 98 Cal. 19, [35 Am. St. Rep. 133, 32 Pac. 708] ; *Callan* v. *Bull*, 113 Cal. 593, [45 Pac. 1017] ; *Elledge* v. *National R. R. Co.*, 100 Cal. 282, [38 Am. St. Rep. 290, 34 Pac. 720, 852] ; *Nixon* v. *Selby etc. Co.*, 102 Cal. 458, [36 Pac. 803].) . . . It is also one of these duties to give careful instructions, directions, and warnings to a youthful or inexperienced servant of unusual and hidden dangers, of which the employer is aware, and of which the servant, to the employer's knowledge, is ignorant.'' But there can be absolutely no doubt that the general foreman of construction, who ordered the boy to assume and discharge the duties of conductor, was in no sense a fellow-servant of the plaintiff. The respective general duties of the two were altogether dissimilar. He exercised authority, in the service of the defendant, superior to that of the plaintiff. He, in point of fact, among other duties, had the authority, if not to employ laborers, to assign them to particular duties in the work of construction, etc. Within the scope of his duties, he was, therefore, strictly a vice-principal or agent of the defendant, and upon him rested the duty which the defendant owed to the plaintiff of so instructing and warning the latter as to the dangers of the duties of conductor as to enable him to

fully realize and appreciate such dangers. (*Ingerman* v. *Moore,* 90 Cal. 410, [25 Am. St. Rep. 138, 27 Pac. 306], and authorities cited; *Ryan* v. *Los Angeles etc. Co.,* 112 Cal. 244, [32 L. R. A. 524, 44 Pac. 471] ; *Gibson* v. *Sterling Furniture Co.,* 113 Cal. 1, [45 Pac. 5] ; *Verdelli* v. *Gray's Harbor etc. Co.,* 115 Cal. 517, [47 Pac. 364, 778] ; *Higgins* v. *Williams,* 114 Cal. 176, [45 Pac. 1041] ; *Mullin* v. *California Horseshoe Co.,* 105 Cal. 77, [38 Pac. 535] ; *Henley* v. *California etc. Co.,* 127 Cal. 232, [47 L. R. A. 597, 59 Pac. 577] ; *Shea* v. *Pacific Power Co.,* 145 Cal. 680, [79 Pac. 373].) His failure, therefore, to warn and instruct the plaintiff as to the hazards of the employment in which he was thus required to engage— hazards unusual to a youth without previous experience in such work—constituted the act of omission and consequent negligence of the defendant.

As before indicated, it is clear that all the evidence upon that question plainly and unmistakably shows that both the motorman and the general foreman of construction, in their transactions with the plaintiff as shown by such evidence, sustained the relation of vice-principals to the defendant, and that there having been introduced into the record no evidence showing or tending to show that they were fellow-servants of the plaintiff in the sense that the defendant could not be held responsible for any act or acts of theirs resulting in injury to plaintiff, it follows that the rejection of the instructions here referred to did not constitute error. It is a proposition too obvious to require reference to authorities to prove it that a trial court is never required to submit to a jury the law upon an uncontroverted question of fact. However, the following cases expound the rule as thus stated: *McNamara* v. *Macdonough,* 102 Cal. 581, 583, [36 Pac. 941] ; *Tompkind* v. *Mahoney,* 32 Cal. 235; *Terry* v. *Sickles,* 13 Cal. 429; *Caulfield* v. *Sanders,* 17 Cal. 573; *Robinson* v. *Western Pac. R. R. Co.,* 48 Cal. 424; *Watson* v. *Damon,* 54 Cal. 279; *State* v. *Osborn,* 45 Iowa, 425, 428; Brickwood-Sackett on Instructions, sec. 199.

The rejection of defendant's proposed instruction No. 55 cannot, under the circumstances, be held to have been prejudicial to the defendant. This instruction would have told the jury that if there were two ways, one safe and the other dangerous, by which the plaintiff could have performed the

duties of conductor, and that plaintiff, having knowledge of those two ways, undertook to perform those duties in the dangerous rather than the safe way, and was thereby injured, he would be guilty of contributory negligence and the defendant absolved from liability. The sole act of negligence of the defendant, according to the jury's findings, was that of failing to warn the plaintiff of the dangerous character of his duties. The plaintiff was, according to an express finding of the jury, educed from sufficient evidence, ignorant of the manner of performing the duties of trolley-tender, and was ordered by the general foreman of construction to obey the directions of the motorman with regard to the performance of those duties and, in obedience to the order thus given, was only doing what the motorman told him to do when he met with the accident. "He had," as counsel for the respondent aptly suggest, "no choice of two ways in performing his duty. His duty, as he saw it, and as he had been instructed by Graham, was to obey Kleupfer." The instruction would, therefore, have had no application to the particular act of negligence upon which the jury manifestly founded their verdict.

There is discussed in the briefs but one of the rulings on the evidence to which exceptions were reserved. The defendant, for the purpose of showing reasonable care in the selection of the mechanical appliances used upon its cars, sought to prove the "advertised test" of the manufacturers of the trolley-poles used by it. The court, under an objection, refused to permit the defendant to show by one of its witnesses what such advertised test disclosed in that respect. The court excluded the testimony on the ground that it was hearsay. But, without deciding whether the exclusion of the testimony on that ground was or was not erroneous, it is very clear that, since the issue as to the alleged negligence of the defendant by reason of the alleged defectiveness of the trolley-pole was eliminated from the case by the jury, and, therefore, formed no part of the basis of the general verdict, the ruling was harmless.

We have now specially noticed all the principal points which we have felt required such consideration in this opinion, and our final conclusion is, as must be apparent from

the foregoing discussion, that there has been shown to exist no just reason why the judgment and order should not stand.

Accordingly, the judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 10, 1912, and the following opinion then rendered thereon:

HART, J.—There are three propositions upon which a rehearing of this cause is asked of this court, viz.: (1) That we fell into error in the statement that the amendment by the legislature of 1909 of section 625 of the Code of Civil Procedure, relating to the matter of the submission of particular questions of fact and special issues to juries, by which amendment trial courts are given discretion as to the matter of the submission of such questions and issues, was in force at the time of the trial of this action; (2) that this court is mistaken in the declaration "that there was no evidence which would warrant the submission to the jury of the defense as to negligence of a fellow-servant"; (3) that this court ignored the proposition contended for by the defendant, that there is "no evidence sufficient to show any causal connection between the negligence found by the jury to exist and the plaintiff's injuries," the contention being urged in the petition that the evidence affirmatively showed that there was no such causal connection.

1. As to the first point, we confess that we were in error in the declaration that section 625 of the Code of Civil Procedure, as amended in 1909, had taken effect and was in force at the time of the trial of this action. We now find, upon a closer examination, that the amendment was approved on the sixth day of March, 1909, but, as no other time was fixed in the act amending the section, the amendment, under the terms of section 323 of the Political Code, did not go into effect until the sixtieth day after its passage. The trial of this action was commenced and completed before the expiration of that period, and the amendment was, therefore, not in force at that time.

But it is plainly manifest, if our conception of the issues presented by the complaint and of the effect of the answers

returned by the jury to certain particular questions of fact, considered in connection with their failure to answer certain other questions, as explained in the original opinion, be sound, then it became immaterial whether the section as it stood prior to the amendment or as it stands as amended was in force and applicable at the time of the trial of this action. In our original opinion, although mistaken as to the fact of the force of the amendment at that time, we tried to make this proposition clear. At any rate, the necessary effect of our views upon this point was that it was a matter of indifference, under the circumstances of the case, whether the original or amended section was applicable. If the jury had answered favorably to the defendant all the particular questions of fact bearing upon the issue as to the defective trolley-pole, there would have been no inconsistency between such answers and the general verdict, since, as is conclusively shown by the record, the general verdict was founded solely on another and different issue of negligence tendered by the complaint. After the return of the general verdict, with the answers to the particular questions of fact involved in the last-mentioned issue of negligence, said answers fully supporting the general verdict on that issue, it became wholly unnecessary to further consider the action of the jury on the particular questions of fact involved in the issue to which the general verdict could obviously have no relation. That issue was entirely eliminated from the case by the jury, and thus, figuratively yet truly speaking, it became a cadaver into whose lifeless veins no amount of blood could be injected by means of answers to interrogatories bearing thereon that could restore to it the power of respiration; hence, as stated, it became wholly immaterial whether the questions to which the jury were unable to formulate and return answers were answered or not answered, or how answered, so far as is concerned any effect any answers which might have been given might have upon the verdict as returned. See *Pigeon* v. *Fuller*, 156 Cal. 696, 701, [105 Pac. 976], where this question is exhaustively considered.

2. After a careful re-examination of the record, we are satisfied with the conclusion heretofore arrived at that there was no evidence to which the requested but rejected instructions relating to the fellow-servant defense pleaded in the

answer are applicable. Counsel do not claim that testimony addressed to that defense was offered by the defendant, but the contention is that whether the motorman, whose instructions as to the manner of performing his duties the plaintiff was ordered by the general foreman to obey, was a fellow-servant of the plaintiff in the technical sense of that term or a vice-principal of defendant in his relation to the plaintiff, ''depends upon the proper construction of the evidence relating to plaintiff's age and experience, and whether he received sufficient warning or instruction,'' and that, therefore, it was for the jury to determine from the evidence addressed to that fact whether his age and intelligence ''were sufficient to give him the discretion necessary to the discharge of his duties as trolley-tender,'' or, ''being inexperienced, he had received sufficient warning and instruction.'' It is argued that these facts, proved, if at all, by evidence produced by the plaintiff, were reasonably susceptible of deduction from the evidence so received, and it is further argued, had the jury found that the plaintiff either had sufficient intelligence and experience or was warned as to his duties and the hazardous character thereof, the defense of fellow-servant would have been unquestionably established. Therefore, it is insisted, the court seriously erred by refusing to submit to the jury the question whether Kleupfer, the motorman, was a fellow-servant of the plaintiff. We think that no question can arise from the evidence that the motorman, having been delegated by the general foreman of construction, of whose authority as an agent or vice-principal of the defendant in the transaction with the plaintiff we entertain no doubt, to direct the plaintiff in the matter of the performance of his duties, thus became and stood toward the plaintiff as more than a mere fellow-servant. In other words, we think the evidence fairly shows that, as to his relation to the plaintiff, the motorman was placed squarely in the shoes of the defendant by one having the authority to put him in that position.

But, in the light of the action of the jury, as shown by their general verdict and their answers to the interrogatories relative to the issue of negligence involved in the omission of the defendant to warn the plaintiff of the hazardous nature of his employment, we are unable to perceive in the question whether the motorman was a fellow-servant of the plaintiff

any very great importance, so far as any influence it might exercise or effect it might have upon the particular act of negligence which the jury found was the proximate cause of plaintiff's injuries. Graham, who ordered the plaintiff to take the position of trolley-tender and to obey the directions of the motorman, was in no sense a fellow-servant. This proposition the court was at liberty to assume as a matter of law from the undisputed testimony. He was a general foreman of construction, or, in fact, a deputy under the general superintendent of construction for the defendant. In his capacity as general foreman, Graham had the authority to assign employees to the various employments involved in railroad construction for the defendant, or, if this is stating his authority too broadly under the evidence, he was at any rate undoubtedly given power by the superintendent of construction to assign the plaintiff to whatever employment he conceived the boy to be fitted for, or his own discretion might suggest. In the exercise of this authority, Graham clearly and unmistakably acted as the agent or vice-principal of the defendant. It was, therefore, his duty, acting for the defendant in this matter, to do that which it was incumbent upon his principal to do, viz., warn the plaintiff of the dangerous character of the duties of a trolley-tender. If he failed in this duty, then the fault or culpable negligence of the defendant and to which the cause of plaintiff's injuries must be traced lies, primarily, in such failure, and as it is this act of negligence which the jury found had caused the injuries, and as the act of negligence so found involves, essentially, the elements of youth, want of experience, incapacity in the plaintiff, and the duty of obedience on his part to his superiors in years, in experience and in authority, the very failure to warn him of the hazards of the duties to which he was assigned constituted the gist of the offending by the defendant. Therefore it seems to us, as already suggested, that it must be true that it can make little material difference, so far as sustaining this act of negligence is concerned, whether the legal relation existing between the plaintiff and the motorman, as coemployees of the defendant, was that of fellow-servants or of employee and vice-principal. In other words, the negligence of the defendant, which it was found directly caused the injuries to plaintiff, originated in and relates solely

to the failure of the defendant to discharge the first duty it owed to a youth of inexperience and want of capacity assigned to the performance of duties beset by danger and peril to life and limb, and it seems to us that, under these circumstances, it must compel the laying down of not only an unreasonable but a barbarous rule to hold that the boy, ordered and expected, as to the manner of performing duties to which he was a stranger, to obey the person under whose immediate directions he was placed, should be held responsible for the mistakes or negligence of such person, even though the latter might have been a fellow-servant within the legal meaning of that expression; for, how could this inexperienced youth, lacking in that degree of judgment necessary to be exercised in the prosecution of occupations requiring some measure of skill, and which can ordinarily come only through experience, know when the directions given him by the motorman, and which he was ordered to follow, were erroneous or the result of mistaken judgment or of negligence? Most assuredly, it may be remarked, if the negligence charged against the defendant were based solely upon the alleged defective condition of the trolley-pole, or if the jury had ignored or found against the plaintiff upon the issues of negligence involved in the alleged omission of the defendant to warn the plaintiff of the dangerous character of the services which it required him to perform and founded its verdict solely upon the alleged negligent maintenance of a defective trolley-pole, then the question whether Kleupfer was a fellow-servant would be of vital and supreme importance. But, as has been shown, the situation here represents the very reverse of the supposititious case thus stated.

But let us now see, by a brief examination of the proofs, if it is not true that the court was justified in holding, as a matter of law, that the evidence incontrovertibly established the proposition that both Graham and Kleupfer were, in the transaction of which this action is the outgrowth, acting as vice-principals of the defendant, and that, therefore, the rejection of the ''fellow-servant'' instructions was clearly warranted.

The testimony shows without contradiction that the plaintiff was without previous experience in the line of duty to which he was put; that, in fact, he had never had any experi-

ence with or in the use of the mechanical appliances employed in the operation of trolley-cars; that he was warned by no one of the hazards of the occupation to which he was assigned on the car. The plaintiff testified that, when he went to work on the car, he had had no experience in the manipulation of the mechanical appliances employed in the operation of trolley-cars, and that by no one was he given any warning as to the dangers involved in the discharge of the duties of trolley-tender. The motorman, it will be recalled, remonstrated with Graham against putting a boy of the tender years and inexperience of plaintiff in the position of trolley-tender, saying, in effect, that a boy of plaintiff's age, wanting in experience in that line of duty, might meet with an accident. Upon these points, the plaintiff and the motorman were not contradicted. Indeed, the testimony of Graham, testifying for the defendant, corroborates that of the plaintiff. He testified that he ordered the boy to take the position and to discharge the duties of trolley-tender, and admitted that at no time did he warn or explain to the plaintiff the dangerous character of the duties which he had been ordered to perform. He further testified, as we have seen, that the superintendent of construction of the defendant sent the plaintiff to him (Graham) with instructions to put the lad to work at some employment, without designating the nature thereof, thus leaving to Graham, as the defendant's foreman of construction, the discretion of determining the character of the employment to which he might put the plaintiff. He admitted, and the fact is nowhere disputed, that he placed the boy as trolley-tender under the direct control of the motorman, and gave the lad explicit directions to obey the orders of said motorman in the performance of his duties. Thus, it will be observed, the motorman was as to the plaintiff, as employee of the defendant in the capacity of trolley-tender, placed by the general foreman in the latter's position; that is, he thus became agent or vice-principal of the defendant. It is therefore very clear that the court was fully justified in holding as a matter of law that the evidence showed that both Graham and the motorman, so far as the plaintiff was concerned, were vice-principals of the defendant.

3. It is stated in the petition, as we have already shown, that this court in its former opinion ignored or failed to con-

sider the contention that there is no evidence disclosing causal connection between the negligence found by the jury and the injuries sustained by the plaintiff. The negligence which the jury found had proximately caused plaintiff's injuries was fully considered in the original opinion, and it was there held, as we now hold, that the evidence was sufficient to support the finding of the jury that the direct cause of the plaintiff's injuries lay in the negligence of the defendant to warn him of hazards, connected with the discharge of his duties as trolley-tender, which were not obvious to a person of his age, understanding, and want of experience.

The theory upon which the defendant appears to insist that there is no causal connection shown between the negligence of which the jury found the defendant guilty and the injuries received by the plaintiff is that, in point of fact, the immediate cause of the injuries was the breaking of the trolley-pole.

But the important proposition here is not as to the particular manner in which or the immediate means by which the plaintiff received his injuries, but it is the fact that the defendant negligently put him to work in a dangerous place or where it was hazardous for a youth without experience and general capacity or proper warning to be employed in. These facts proved and the causal connection between the act of omission of the defendant and the injuries was at once established, unless some efficient, independent cause operating to arrest the said first or primary causation intervened. The means by which the plaintiff sustained the injuries—that is, the immediate circumstance that precipitated the injuries— cannot, in a case of this character, be said to have been an independent cause, so interrupting the operation of the original cause or wrong as to have destroyed causal connection between the latter and the injuries. By this we mean to be understood as saying that, unless the plaintiff here were shown to possess experience, judgment, and capacity, or, deficient in these qualifications, had been properly warned as to the hazards of the employment into which the defendant required him to enter, the mere manner in which he may have received his injuries would not constitute an independent cause which in law would have the effect of arresting the primary cause originating in the negligence of the defendant in properly

warning him of the hazards of the employment or of the place in which he was directed to work. It is, of course, to be readily conceded that but for the breaking of the trolley-pole the plaintiff would not have been injured at all, but the negligent act which made possible the accident to the trolley-pole and the consequent injuries to the plaintiff had already been committed. In brief, the circumstance of the breaking of the pole constituted only a concurrent cause of the injuries, and it can argue nothing against the position, sustained by the undisputed testimony in this case, that the original wrongful act of omission on the part of the defendant was the primary act of negligence producing the injuries and ceased not in its operation from its inception until its lamentable culmination. ''The original act of negligence, the primary causation,'' says Mr. Justice Henshaw, in the case of *Merrill* v. *Los Angeles Gas & Electric Co.*, 158 Cal. 499, [139 Am. St. Rep. 134, 111 Pac. 534], wherein the precise question in hand is very learnedly considered and discussed, ''may be in its nature so continuous that the concurrent wrongful act precipitating the disaster will in law be regarded not as independent, but as conjoining with the original act to create the disastrous result.'' The primary causation here could not, by its very nature, be otherwise than continuous, for it was the very germ from which the ultimate damage developed and without which there would perhaps have been no damage. Its wrongfulness followed, permeated, and inhered in every subsequent act of the plaintiff in discharging his duties as a trolley-tender, and the breaking of the pole was only a necessary ally in the production of the disastrous result which, in all reasonable probability, it was, from its very inception, destined to bring about.

But much stress is laid upon the fact, as to which there is some evidence, that the plaintiff was unusually bright and intelligent and apt at acquiring knowledge, that as a messenger and a water carrier he had had opportunity to observe the manner of operating trolley-cars, and that, being bright and intelligent, thus he must have acquired sufficient knowledge of operating such cars to qualify him to intelligently perform the duties of trolley-tender. It may be conceded that the plaintiff was of unusual intelligence for one of his years and quick to grasp ideas, but there is no evidence, other than that showing ability to readily learn, that he did

acquire any knowledge of the manner of handling with any skill the mechanical appliances used in propelling trolley-cars. Indeed, the only testimony that can even be construed into the statement of a fact justifying the theory that the plaintiff was, in the absence of specific instructions and warning on those lines, intelligent enough to exercise sound or mature judgment in the discharge of the duties of trolley-tender or to appreciate and realize the hazards thereof, is that portion of Graham's testimony wherein he stated that he first asked the boy if he thought he "could fill the job," and to which question the plaintiff answered affirmatively. But this testimony falls far short of showing, or even tending to show, that the boy appreciated or could appreciate without warning or instruction from older heads the great danger and hazards attending the discharge of the duties of trolley-tender on a work car. Indeed, in our opinion, if the answer of the boy tends to show anything of importance at all, it is that he did not realize the difficulties and hazards of the position, otherwise he would not have so readily expressed confidence in his ability to perform duties, obviously more or less difficult, even with an inexperienced adult, with which he had had no previous experience, and thus much more strongly is the reason emphasized for the necessity for giving him proper warning and instructions before he entered upon the performance of the work. But, in any event, the statement of the plaintiff that he could perform the service did not absolve the defendant from the duty of fully and clearly instructing and warning him as to the hazards of the new duties which it had ordered the boy to perform. The plaintiff's youth was apparent and his want of experience known to the defendant, and the law will not permit it to excuse its negligent failure to perform its duty by the plea that the boy said or thought he was fully capable of discharging the duties of a trolley-tender. It is, in other words, the imperative duty of a master, when employing a youth of inexperience in the particular line of work upon which he proposes to place him, if such employment necessarily involves hazards to him who engages in it, to warn such youth of such hazards before the latter enters upon its exercise so that he may be fully able to appreciate and realize the hazards to limb and life he is thus to be put

19 Cal. App.—5

up against, and a failure to perform this duty under the circumstances indicated constitutes culpable and actionable negligence.

We have thus considered the petition for a rehearing *in extenso* because of the importance of the legal questions involved in this record, and, furthermore, because we desired to express our views upon those questions as fully and as clearly as we conceived to be necessary and possible.

We are firmly of the conviction, for the reasons stated in the former opinion as well as those herein ventured, that no substantial reason has been shown or exists for a reversal of the judgment and order, and therefore the petition for a rehearing is denied.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 10, 1912.