[Civ. No. 999.   Third Appellate District.—January 13, 1913.]

## MATHEW RYAN, Respondent, v. OAKLAND GAS, LIGHT AND HEAT COMPANY, Appellant.

TRENCH CONSTRUCTED BY GAS COMPANY—BRACING COMMITTED TO VICE-PRINCIPALS—WANT OF PROPER BRACING—NEGLIGENCE—DAMAGE TO PLAINTIFF.—A gas company engaged in constructing a trench, the bracing of which to prevent injury was committed to the superintendent and foreman as vice-principals, to whom materials were committed for that purpose, is liable in damages to the plaintiff, who while engaged in the work of throwing dirt from a trench was injured by the breaking down of the wall of the trench, thus causing fractures of the pelvis bone and great physical and mental suffering and incapacity to labor, owing to want of proper bracing of such wall by the vice-principals, and also owing to the direct known negligence of the defendant, without plaintiff's knowledge, in placing him in a position of peril from a parallel covered ditch, which weakened the wall of the trench, and contributed to the injury and damage suffered by the plaintiff.

ID.—DUTY OF MASTER TO SERVANT—DELEGATION OF DUTY TO FELLOW-SERVANT—REPRESENTATION OF MASTER.—Where the master owes a duty to his servant, he cannot escape responsibility for its proper performance or liability for an injury to one servant by a failure to perform such duty by delegating its performance to another servant. The fellow-servant to whom the performance of such duty is assigned becomes, with respect to that particular duty, the special representative of the employer, sometimes called a vice-principal. In such case the negligence of the fellow-servant is the negligence of the principal, for which the latter must answer.

ID.—RULES AS TO USE OF MATERIALS BY SERVANTS INAPPLICABLE—MATERIALS USED BY MASTER'S REPRESENTATIVES—WORK OF BRACING NOT BY FELLOW-SERVANTS.—The rules applying to cases in which the materials are committed to be used by the servants themselves, rendering the master irresponsible for defects in their use or preparation for use, are inapplicable, where the materials for use were committed only to the master's representatives, to be used by them for the purpose intended, in which case the master is responsible. It cannot be said that either the superintendent of the work or the foreman or carpenter employed in the preparation and use of materials for the bracing of the trench, were fellow-servants with the plaintiff, whose employment was distinct from theirs.

ID.—RULE AS TO CHANGES IN PLACE OF WORK—QUESTION OF DANGER.—The rule that where there are frequent changes in the environment of a servant, the master is not bound to protect the servant from

dangers resulting, is inapplicable, so far as the question of resulting danger is concerned, as no danger appears to have resulted from any changes in the work, and the men were furnished with no means of protecting themselves .from any danger, and there was a hidden danger for which defendant alone was responsible, which contributed to the caving in of the wall.

ID.—DUTY OF DEFENDANT TO PROTECT PLAINTIFF .BY BRACING WALLS—QUESTION FOR JURY.—Where it reasonably appears that if defendant had continued to protect its workmen from injury as it had previously done, by bracing the walls of the trench, no injury would have resulted to the plaintiff, the question whether it was its duty at the time of the injury to brace the walls for the protection of the plaintiff, was a question of fact, for the jury to determine. The questions whether the depth and character of the soil, and the hidden causes known only to defendant, were such facts as to make it defendant's duty to brace the trench, were questions peculiarly within the province of the jury.

ID.—INSTRUCTIONS AS TO DAMAGES—ABSENCE OF ERROR—CONSTRUCTION AS TO "PHYSICAL AND MENTAL PAIN SUFFERED OR TO BE NECESSARILY SUFFERED."—It is held that no error appears in the instructions on the subject of damages. An instruction as to "mental and physical pain suffered or to be necessarily suffered," is to be construed as to the mental and physical pain suffered as referring to past time, and the words "to be necessarily suffered," are to be construed as implying such mental and physical pain as are reasonably certain to be suffered in the future.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. Wm. H. Waste, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, for Appellant.

Fitzgerald & Abbott, for Respondent.

CHIPMAN, P. J.—The complaint in this case was filed in December, 1904, and was brought to issue by answer in October, 1905. On appeal from the judgment at the first trial it was held that the evidence was sufficient to support the verdict in favor of plaintiff but the judgment was reversed because of an instruction which, in the opinion of the appellate court, took from the jury a question of fact. *Ryan v. Oakland Gas etc. Co.*, 10 Cal. App. 484, [102 Pac. 558].)

Respondent contends that, so far as the facts are concerned, the decision on the first appeal is the law of the case, inasmuch as the evidence is substantially the same—indeed, differs only in the fact that some additional testimony favorable to plaintiff was introduced. It would occupy about as much time and space to determine whether or not respondent's contention is sound as it would to determine the facts for ourselves; therefore, we shall not accept the law of the case upon the facts as having been established.

Plaintiff brings the action to recover damages for personal injury while at work as a laborer digging a trench for defendant in the streets of Oakland. The injury complained of occurred July 5, 1904.

Paragraph IV of the complaint is as follows: "That the said excavation and construction of said trench, at said time and place, was dangerous to the life, body and limbs of plaintiff, while employed as aforesaid, unless the walls and banks of said trench were braced and secured from falling or caving in on plaintiff while standing in said trench, and engaged in his said employment as aforesaid; that said danger consisted in the liability that the walls and banks might fall and cave in on plaintiff while working in said trench, because of the character of the soil, as hereinafter stated; that said danger to plaintiff, while working and employed as aforesaid, unless said walls and banks were braced and secured as aforesaid was at all times known and familiar to said defendant and its said superintendent and vice-principal; but that despite said knowledge of said danger to plaintiff, while working and employed as aforesaid, said defendant and its said superintendent and vice-principal did not brace, or in any way secure, said walls and banks from falling upon, or caving in on plaintiff while engaged in said trench as aforesaid; but on the contrary, willfully, knowingly and carelessly failed and neglected to brace, or in any way secure, said walls and banks from falling or caving in on plaintiff while working as aforesaid; that had said wall been braced and secured as aforesaid, the injuries to plaintiff hereinafter alleged, could, and would not have happened."

Then follow averments particularizing at considerable length the character of the work plaintiff was doing, his inexperience in similar situations, the circumstances attending the

accident, the character of the soil and its liability to cave, plaintiff's ignorance of the danger, defendant's failure to provide against the injury that befell plaintiff by carelessly and negligently failing to brace the walls of said trench to prevent their caving in and in failing to inform plaintiff of the dangerous character of his said work, by reason of which plaintiff "was violently jammed and pinned by said falling wall against the opposite wall of said trench, and suffered great bodily hurt and injury by the fracture in two places of the pelvis bone."

Paragraph VII is as follows: "By reason of said injury, received through the negligence and carelessness of defendant, as aforesaid, said plaintiff has been ever since said time sick, sore, lame, prostrated and rendered incapacitated from performing any labor, and from attending to any kind of business or duty whatever, and has undergone great physical suffering and agony, and will continue lame and incapacitated from performing any labor for the rest of his life."

The answer is a specific denial of most of plaintiff's averments except as to the fact that he was injured while working for defendant.

As a separate defense it is alleged that plaintiff and his fellow employees working in said trench were at all times cautioned to brace the walls and that defendant furnished lumber and materials for that purpose; that it was part of plaintiff's duty to prevent the walls of said trench from falling by bracing the same, of which plaintiff was fully aware, and that the accident resulted from plaintiff's neglect in this regard and that he voluntarily assumed all risk. It is also alleged that the injury to plaintiff was not the result of the earth falling on him but of his struggle "to free himself without the assistance of his fellow-employees although cautioned by them to allow them to assist him and extricate him from the soil."

It developed at the trial that the walls of this trench were weakened by another parallel trench which had the year before been dug alongside and near to the trench in question which defendant well knew and of which plaintiff was ignorant and that this fact contributed to the accident. An amendment to the complaint was allowed to conform to these

facts. An answer was also filed denying the averments of the amendment.

Plaintiff was employed by defendant in digging a trench which defendant was sinking, in Oakland, for the purpose of laying its pipes. The ditch began near First Street, came up Brush to Second, then easterly on Second to Grove Street, thence southerly on Grove. On Brush and Second streets the ditch was braced, and on Saturday, July 2, 1904, the ditch on Grove Street had been run about thirty or forty feet. It was between four and five feet deep and about three and one-half feet wide. The men ceased work Saturday afternoon, the third was Sunday and Monday, the fourth, was a holiday; they resumed work on Tuesday morning. After the men had been working about two hours, the eastern bank of the ditch gave way, catching plaintiff who was working in the trench. This ditch was parallel to a wall surrounding the defendant's property, about three feet away. A year or more prior to digging the trench a ditch had been dug between it and the wall parallel thereto for the purpose of laying a gas pipe about two inches in diameter. Kirk was superintendent of the company; "did the employing and discharging of men and directed the work generally when present." Welling was foreman and, in Kirk's absence, "directed and discharged the men." Welling testified: "There was a carpenter employed by the company at that time. His name was Dillon. His work was to do such carpenter work as might be necessary in bracing up and timbering the ditch that should be braced. As a matter of fact this ditch on Grove Street where Ryan was hurt was not timbered up or braced. We timbered all the ditch on Second Street as we came along Second Street for two blocks." Dillon testified: "This ditch that was being constructed from Brush Street up to Grove and down Grove Street, in 1904, I braced it, or cribbed it, to keep it from caving. I know there was an accident July 5, 1904. I came up there that morning. I did some work there that morning. I went there to see if they wanted any more bracing put in. I saw Mr. Kirk and Mr. Welling, I think, was there. I asked Mr. Welling if he wanted any more bracing done, and he said he did not think it was necessary. I don't think there was any lumber there that morning to do the cribbing. After Mr. Kirk told me that I went on over to another

job I was looking after. I didn't return until after the accident. I was not there at the time of the accident." On cross-examination he testified. "I don't know as I know precisely what the foreman said. Mr. Kirk said he didn't think it would need any bracing there, it was getting shallower, so I went over to the purifiers. . . . Mr. Welling never gave me any instructions when Mr. Kirk was there, otherwise he acted in the capacity of foreman." There is conflict in the evidence as to whether there was cribbing material at or near the trench where plaintiff was at work. There was evidence justifying the jury in finding that such material was not there. And the fact that Kirk and Welling concluded that no bracing was necessary would account for there not being any material on hand to do the bracing. Moreover, the evidence showed that it was no part of plaintiff's work or duty in performing his task to do this bracing. Dillon was specially employed to do this under the direction of either the superintendent or, in his absence, of the foreman, and their relation to the work was such as not only gave them authority to determine whether cribbing should or should not be used as their judgment might dictate, but devolved this duty upon them.

Nor can we admit the soundness of defendant's argument that Kirk and Welling were fellow-servants with plaintiff, thus giving effect to the rule in such cases and relieving the defendant from liability. That the place in which plaintiff was working was dangerous is not seriously disputed; that he had no warning of the danger, except such as his own judgment would suggest to him, is not questioned; that the superintendent knew of the danger is manifest from the fact that he caused the trench to be braced until Grove Street was reached; and it was by his direction that the ditch along Grove Street was not cribbed. Plaintiff had nothing to do with this part of the work except as directed by the superintendent or foreman; his work was with the pick and the shovel and he had a right to assume that the superintendent was guarding his safety in the place where he was working so far as this particular work of cribbing or bracing was concerned. We entertain no doubt from the facts disclosed in this case that Kirk certainly, and, we think also, Welling, was the agent of defendant, or its vice-principal. What was

said in *O'Connell* v. *United Railroads,* 19 Cal. App. 36, 54, [124 Pac. 1022, 1030], is equally applicable here: "It may be said to be true that, in a general sense, or generally speaking, the motorman and conductor of an electric work-car are fellow-servants, but the books are full of cases showing where one fellow-servant, in the discharge of a particular duty for his employer, may become, by reason of the peculiar nature of such duty, the master's agent so as to bind the latter for any damage resulting from its negligent execution. The rule is that where the master owes a duty to his employee he cannot escape responsibility for its proper performance, or liability for an injury to one servant occasioned by a failure to perform such duty, by delegating its performance to another servant. (*Tedford* v. *Los Angeles Elec. Co.,* 134 Cal. 79, [54 L. R. A. 85, 66 Pac. 76].)" In the Tedford case the court said: "The fellow-servant to whom the performance of such duties is assigned becomes, with respect to that particular duty, the special representative of the employer— sometimes called a vice-principal. In such case negligence of the servant is the negligence of the principal, for which the latter must answer." (Citing cases.)

There was evidence that the parallel ditch referred to weakened the bank and added a further danger to the workmen on the ditch being dug and had a tendency to cause the caving. This was known to defendant and was unknown to plaintiff. He had no special knowledge or experience in ditch digging either along the streets of Oakland or elsewhere. It is contended by appellant that "where the place in which the employees are working is made by the employees themselves, and material suitable in quantity and quality to make it safe and suitable tools and competent men to assist are furnished by the master, if the place be not made safe through the omission to use or negligent use of such materials even though by a foreman or even by a superintendent, the negligence is that of a fellow-servant for which the master is not responsible." *Callan* v. *Bull,* 113 Cal. 593, 605, [45 Pac. 1017]; *McDonald* v. *Hoffman,* 10 Cal. App. 515, [102 Pac. 673]; *Kerrigan* v. *Market St. Ry. Co.,* 138 Cal. 506, [71 Pac. 621], are cited in support of this contention. In *Callan* v. *Bull* it was held that "if the appliance is furnished by the master for the purpose of enabling the servants to perform the

work in which they are engaged, he is required to see that
it shall be reasonably safe for that purpose; but if the
preparation of that appliance is a part of the work which
the servant is required to perform, the master is not liable
for any defect in its preparation.'' In that case plaintiff
and other workmen were building a jetty and the place
where the work was to be done was prepared by the laborers
themselves, for which suitable materials were supplied. In
*McDonald* v. *Hoffman,* plaintiff was one of a number of car-
penters ''engaged in the same general work in and about
the construction of a building and warehouse.'' It became
necessary for the workmen to construct a scaffold or plat-
form on which to work. All of the materials necessary for
the construction of the platform were there at their hands.
*Kerrigan* v. *Market St. Ry. Co.* was a case where the plaintiff
and others were engaged in loading ties on a platform car
and the ties were held in place by stakes, on the front and
sides of the car, which were made and adjusted by the men
themselves from material at hand. It is not difficult to per-
ceive that the facts in those cases were very different from
the facts here. Neither Kirk, Welling nor Dillon was en-
gaged in the same work that plaintiff was doing except in the
most general way. They were especially charged with the
duty of determining when and where the trench required
bracing and to attend to having it done. Plaintiff's only
duty was to do the work to which he was assigned,—namely,
to shovel dirt out of the trench. Besides, if there was any
duty put upon him to do the bracing the jury found on
sufficient evidence that materials for that purpose were not
furnished.

In this connection it is urged by appellant that the place
of work changed with the work and that no omission of duty
owed by the defendant to plaintiff is shown and hence the
verdict should have been for defendant. 2 Labatt on Master
and Servant, section 588, is cited, where the author says:
''Where the work is of such a character that, as it progresses,
the environment of the servant must necessarily undergo
frequent changes, the master is not bound to protect the ser-
vants engaged in it against the dangers resulting from those
changes.'' It cannot be said that the place of the work
changed in the sense contemplated by the cases cited in sup-

port of the text so far as any danger attended the work. And had defendant continued to protect the workmen by bracing the sides of the trench as it had done up to the day before the accident, no injury would have occurred. The rule contended for does not apply in this case because materials were not furnished the men in the ditch to protect themselves, and there was a hidden danger in the covered ditch that had been dug alongside of the ditch in which plaintiff was working known to defendant and unknown to plaintiff and there was evidence that this old ditch contributed to the caving in of the walls. Furthermore, the question whether it was defendant's duty to brace the trench was a question for the jury. "Whether the depth of the soil, the hidden causes known only to defendant, and the character of the soil, were such facts as to make it the duty of the defendant to brace the trench, was a question peculiarly for the determination of the jury." (*Ryan* v. *Oakland Gas etc. Co.,* 10 Cal. App. 490, [102 Pac. 560].)

Error is claimed in the giving of the following instructions:

"16. If you find that the plaintiff is entitled to recover, you may award him such damages, within the amount claimed, as, in your opinion, will compensate him for the pecuniary damages proved to have been sustained by him and proximately caused him by the wrong complained of. And, in estimating the amount of such damages, you may consider the physical and mental pain suffered, if any, the nature, extent and severity of his injury or injuries, if any, the extent degree and character of suffering, mental or physical, if any, its duration and its severity, and medical expenses incurred or paid, the cost of nursing and attendance, if any, and the loss of time and value thereof, and the loss of earning capacity, if any.

"You may also consider whether the injury, if any, was temporary in its nature, or is permanent in its character. And from all these elements, you will resolve what sum will fairly compensate the plaintiff for the injury sustained.

"17. If you find that the plaintiff is entitled to recover, the measure of his recovery is what is denominated compensatory damages, that is such sum as will compensate him for the injury he has sustained.

"The elements entering into this damage are the following.

"1. Such sum as will compensate him for the expenses he has incurred in caring for and nursing him during the period that he was disabled by the injury, not exceeding the amount alleged in the complaint.

"2. The value of his time during the period that he was disabled by the injury.

"3. If the injury has impaired the plaintiff's power to earn money in the future, such sum as will compensate him for such loss of power.

"4. Such reasonable sum as the jury may award for pain suffered or to be necessarily suffered from the injury.

"The first two of these elements are the subject of direct proof and are to be determined by the jury on the evidence they have before them. The third and fourth elements are from necessity left to the sound discretion of the jury, but the damages in all cannot exceed the amount alleged in the complaint."

Appellant seeks a reversal because the court, in these instructions, "makes no distinction between mental and physical suffering" and, furthermore, that "the vice of all this is that the complaint does not charge any mental suffering; it merely alleges past physical suffering and does not allege future pain, physical or mental."

Instruction No. 16, we think, should be read as in the past tense and as referring to past physical and mental pain. The courts apply a different rule where the plaintiff sues in a representative capacity and where the victim of the injury is the plaintiff. In the latter case damages for physical and mental suffering may be recovered. (*Melone* v. *Sierra Ry. Co.*, 151 Cal. 113, 116, [91 Pac. 522].)

Paragraph 4 of instruction 17 is attacked on the ground that it makes no distinction between mental and physical suffering. The rule of damages is laid down in section 3283 of the Civil Code: "Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future." In *Melone* v. *Sierra Ry. Co.*, the jury were instructed that an element of damage was "such reasonable sum as the jury shall award him on account of the pain and anxiety that he has suffered or *may suffer* by reason of his injuries." Also that the jury may take into consideration "the physical and mental suf-

fering he may have sustained *or may* undergo in the future by reason of his injuries." These instructions were held error while it was also held that the true rule was given in an instruction that plaintiff was entitled to "recover not only such damages as he may have suffered, but also 'such damages as by the evidence it is reasonably certain he will suffer in the future.' " The erroneous instructions were condemned because they left out the element of certainty as to the future suffering, whereas the statute allows only such damages as are "certain to result in the future." The language used in the present case is—"pain suffered *or to be necessarily* suffered from the injury." "Necessarily" means "unavoidably".; "indispensably." (Webster.) A thing which necessarily must happen may reasonably be said to be certain to happen. To say that from a given physical injury physical or mental pain must necessarily be suffered is only another way of saying that it is certain to result. The statute makes no distinction between physical and mental suffering and, in a case where mental suffering is a proper element of damage at all, the damage is not necessarily confined to the date of the trial but "damages may be awarded . . . for detriment . . . certain to result in the future." So far as concerns damages for pain to be suffered in the future, this court held, in *Scally* v. *W. T. Garratt & Co.*, 11 Cal. App. 138, 153, [104 Pac. 325], that they are recoverable, and that case had the sanction of the supreme court. Mental suffering can hardly be said to be susceptible of direct evidence. In personal injury cases mental suffering arises out of the physical injury and depends much upon the extent, character, and probable durability of the injury. It may also arise out of the dread of physical suffering reasonably certain to continue in the future; and this, it seems to us, would be something apart and different from the physical suffering itself. If one is conscious that a long period of physical suffering is in store for him he must necessarily undergo mental anxiety and worry by reason of this feeling. We do not think that mental suffering which may be considered as an element of damage is confined to such injuries as would from their character cause the person to be shunned or would produce a feeling of humiliation and mortification. To be injured so as to cause total blindness would inspire

in one's associates only pity and sympathy.  But mental suffering would inevitably follow such a calamity and such suffering would be something more than and apart from that form of mental suffering described as physical pain, referred to in *Merrill* v. *Los Angeles Gas & E. Co.*, 158 Cal. 499, 512, [139 Am. St. Rep. 134, 111 Pac. 534, 540], cited by appellant. So of one crippled for life and unable ever to engage in occupations to which he was accustomed, or for which he was fitted, he might well be said to suffer mental pain which is "something more than that form of mental suffering described as physical pain." He may in some classes of injuries no longer suffer physical pain but his mental suffering may be none the less acute and may be directly referable to the injury he has received.  In the present case, as we shall see, the plaintiff was on crutches at the time of the trial and had been for over six years, and entirely incapacitated to perform physical labor and was still suffering pain from his injuries.  He was over forty years of age and had no trade, and no sedentary occupation was open to him because his capacity was limited to that of a day laborer.  Thus handicapped, his outlook into the world before him could not be otherwise than accompanied by gloomy forebodings and more or less mental anxiety and suffering.  As mental suffering is something which may be presumed to follow upon a serious injury producing physical suffering and impairment of one's capacity to earn a living, it has been held not necessary to be specially pleaded.  There is a distinction between mental impairment and mental suffering.  It has been held that in the former case it must be specially pleaded and proven (*Comaskey* v. *Northern Pac. Ry. Co.*, 3 N. D. 276, [55 N. W. 732]); but as said in an instructive opinion in *Gagnier* v. *City of Fargo*, 12 N. D. 219, [96 N. W. 841], after having pointed out the seriousness of the injury suffered and distinguishing the Comanskey case: "Such evidence clearly shows physical injuries from which physical pain and mental suffering necessarily follow.  Mental suffering is the natural and necessary result of physical injury, and equally as much so as physical pain.  The physical injury being proved, pain and mental suffering are presumed.  The physical pain and mental suffering need not be pleaded nor specially proved, but are taken to follow as a necessary consequence of the

physical injury, and to be inseparably connected therewith. There is great uniformity in the authorities on this question.'' Citing 1 Sutherland on Damages (2d ed.), secs. 419–421, and numerous cases. (See 2 Sutherland on Damages (3d ed.), sec. 421.)

Mr. Sutherland says: "The jury may consider the case with all its facts, and take into account, not only the physical pain, but also such mental suffering as they are satisfied must have been experienced as the natural result of the wrong done or the injury inflicted.'' (4 Sutherland on Damages (3d ed.), sec. 1243, and a large number of cases in foot note.) "When bodily pain is caused mental suffering follows as a consequence, especially when the former is so severe as to create apprehension and anxiety; as where one is conscious of the impairment of his earning capacity.'' (Ibid.)

Whatever may be the rule of pleading in this state, the trial in the present case was conducted on the theory that physical and mental suffering were proper matters of inquiry. The pleadings were sufficient to warrant the invocation of the rule that it is now too late to make the objection urged. (*Tuffree* v. *Polhemus,* 108 Cal. 670, [41 Pac. 806] ; *Cushing* v. *Pires,* 124 Cal. 663, [57 Pac. 572] ; *Larkin* v. *Mullin,* 128 Cal. 449, [60 Pac. 109] ; *Merrill* v. *Pacific Transfer Co.,* 131 Cal. 582, [63 Pac. 915].)

The subject of plaintiff's injury, its nature and character, its extent, its probable durability, its effect as producing physical pain and suffering, and, at least by inference, its causing mental suffering, were gone into with great minuteness by quite an array of medical witnesses, without objection from either party. These medical examinations have been going on to some extent ever since the accident and were brought down almost to the day of the second trial. No question was raised at the trial that this evidence was outside or beyond the issues. There was evidence that for six and a half years plaintiff had suffered physical pain from his hurt and was then suffering. Plaintiff testified that he was first taken to the receiving hospital, then to his home and from there to the Providence Hospital; he was put in splints for a week or two and next in plaster—from the pit of his stomach to his toes and so remained four or five months, taking medicine daily. "The skin all peeled off from me,

every place the plaster was on." For a while he was wheeled around in a chair after the plaster was removed; he then went on crutches. "I carried crutches 4 or 5 years. . . . I tried various times to get along without them, I couldn't. When the ditch fell in I thought I could feel all my bones cracking. I thought it was the last of me. From that time and while I was in plaster cast I suffered pain around my hips, my legs and my knee. Continues yet at times. I feel it here in the groin, in the back, and in my knee. At the time of the accident there was no difference in the size of my legs, there is now. I don't exactly know what it is, the doctors measured them, the left leg is smaller than the right. I was receiving $2.25 per day at the time of the accident. Since that time I have not been able to do any physical work. I am not able to lift anything, the difficulty seems to be in my back and hips and my leg and am not able to use a pick and shovel at the present time. If I try to walk up an incline or upstairs it hurts me in the knee, from the knee up, in my left leg. The hospital bill was $400. . . . I have never done anything but laboring work, I have no trade." On cross-examination he testified: "These medical examinations have been going on from time to time for the past six years, and up to three weeks ago. Some were made in an endeavor to cure me, others were made for the purpose of ascertaining whether or not I had suffered any fracture."

Dr. James P. H. Dunn and Dr. H. Koford attended plaintiff at the hospital. Dr. Dunn testified: "I determined what his injury was after making an examination of him. . . . He remained in the hospital under my care until the first day of January, 1905, I think. I had a bed prepared especially for him, what we call a fracture bed, and the patient couldn't move, and we could not move the patient on account of the fracture of the pelvis, and I had a mattress made with a trap in it. We examined the fractures of the bones under the anesthetic, then put a bandage about the body, about the hip here, and then applied a splint here from the axilla to the leg, in order to keep the body at rest and stop any movement of the patient, . . . when I was sure there would be no danger of abscess forming and then I placed a plaster cast on the patient from here, covering in that whole leg. (Illustrating.) The plaster cast extended from the lower

ribs down to the toes of the left foot. . . . When I examined
him under the anesthetic I found a fracture of the pelvis.
. . . I am positive that neither of these fractures which I
found united. I am positive that they did not. . . . I have
examined him recently. I am still of the opinion that there
is no union. I have examined him within a week. I will
say that I do not think it advisable to perform the operation
which is possible to create a union there on account of the
danger, and then you don't know, you are not positive what
result you will get. In my opinion Ryan in his present con-
dition is not capable of doing any physical labor. In my
opinion his injuries are permanent. Those fractures which
he had are very rare. He was extremely tender over the
left pubic bone and he is tender now. There is a tenderness
there now. That discoloration I spoke of extends to the
thigh. My charge for treating was $1000. There was a
number of physicians who saw the patient with me." Dr.
Koford testified, corroborating the opinion expressed by Dr.
Dunn. He testified: "After the cast was removed we found
him practically the same as when we put it on. The dis-
coloration was gone, but he had his pain on pressure, he was
unable to stand on his leg. He complained of pain. He was
in the hospital six months altogether. When he left he walked
with crutches. . . . I noticed no difference in the legs of Ryan
when he went into the hospital. They are not the same now."
The left leg, he testified, is smaller and shorter than the
right. Dr. O. D. Hamlin testified: "There was an apparent
shortening or tilting of the pelvis. . . . I would say that the
atrophy in Ryan's left leg was due to injury. From the
fact that the atrophy has existed a number of years, I would
say that the injury would probably be more or less permanent.
Just how permanent or how long that would last it would be
impossible to say. I would say that there was a tendency
for it to last a very long time." Dr. Hamlin examined him
three or four weeks before the trial. Dr. W. B. Coffey ex-
amined him. He testified: "I found that Ryan had a de-
fective locomotion and wasting of his left limb, and the
apparent motion at the junction of the back with one of the
pelvic bones. In addition to that he suffered from an in-
jury to the pubic end of the pelvis." Further describing
his condition he said: "Any serious injury that would pro-

duce motion in that joint would render the individual prac-
tically disabled permanently. It would require a good deal
of force to produce a separation at that point, but after
the injury was received the slightest motion would per-
manently disable a man. It is an uncommon injury.'' He
assisted in an X-ray examination. He testified: ''The picture
here shows there has been a fracture. It is overlapping here
on the left side of the body. Here is a thickening that na-
ture has thrown out to repair the substance, what we call
callous. Shows a complete union at that point with a slight
overlapping. . . . I had Ryan stand up and walk to see if
we could detect any motion at this point that I have pre-
viously mentioned and observed his gait. I could not detect
any motion. If there is motion and this wasting is still
present, and if it is true that he has pain in that point, even
without apparent motion, then he is permanently injured.
There might be motion there and no one detect it. . . . I do
not know whether the man has pain because I cannot question
his honesty or veracity. If he has pain (and he so claimed
when the doctors were examining him) even if it were with-
out motion, then he is permanently injured, and the man is
in a serious condition. I would say worse now than when I
examined him before because it has run a longer period.''
The skill of eight different physicians was sought in an ef-
fort to determine more particularly the permanency of plain-
tiff's injuries. That he had been seriously injured no one
questioned. The controversy seemed to be how serious and
how permanent was the injury. In the somewhat conflicting
testimony there was ample to justify the jury in regarding
plaintiff's injuries as permanent and that he was incapaci-
tated to do manual labor and would so continue for an in-
definite period of time. We may well imagine plaintiff's
mental anxiety and worry and suffering as he was subjected
to this ante-mortem examination by so many doctors, result-
ing at the best in grave doubt of his ultimate recovery or his
ability ever again to earn a living by manual labor.

Defendant's chief reliance for a reversal is that the jury
were permitted to consider future mental suffering as an
element of damage. When we take into account his phy-
sician's fee, one thousand dollars, and the hospital charges,
four hundred dollars, and his earning capacity when he was

injured at $2.25 per day for the working days in six and a half years, the difference between that sum and seven thousand five hundred dollars, the amount of the verdict, it will appear that the jury were not required to speculate as to future damage. The difference is readily accounted for by the physical and mental suffering he endured for this long period, not to speak of the advance in wages since 1904, which would itself more than make up the difference. From this point of view, assuming that plaintiff is entitled to damages, it seems to us inconceivable that defendant should undertake to escape liability altogether because of an imaginary uncertainty as to the period for which damages were awarded for physical and mental suffering. Without considering that plaintiff is in all probability disabled for life, the verdict was reasonable, but if this injury is permanent, as the evidence shows it is, he is but poorly recompensed.

We are unable to take any view of the case that will justify a reversal. The judgment and order are, therefore, affirmed:

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 11, 1913, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 14, 1913.