[Civ. No. 2793.   Third Appellate District.—February 10, 1925.].

## G. MITSUDA, Respondent, v. J. W. ISBELL et al., Appellants.

[1] NEGLIGENCE—VEHICLE LEFT STANDING ON HIGHWAY—CONSTRUCTION OF SUBDIVISION W OF SECTION 20 OF MOTOR VEHICLE ACT.— Subdivision W of section 20 of the State Vehicle Act (Stats. 1919, p. 219), which provides: "No person shall leave standing, or cause or permit to be left standing upon the main traveled portion of any public highway, a vehicle undergoing repair, or which has been stopped for the purpose of having repairs made thereon, or for the purpose of camping; provided, however, that this provision shall not apply to a vehicle which shall be disabled while on such main traveled portion of the highway, in such manner and to such extent that it shall be impossible to avoid stopping such vehicle on said main traveled portion of the highway, and impracticable to remove the same therefrom until repairs shall have been made," means, or was intended to mean, that where some essential part of the mechanical contrivances of a vehicle, while being driven over a highway, gets so out of repair as to render it incapable of performing its work, with the result that such vehicle cannot be moved by the usual method of moving it, then, if it be practicable to remedy the difficulty *within a reasonable time*, the vehicle may be allowed to stand on the highway until the defect or injury is corrected; and such provision clearly contemplates that the use of the highway for that purpose must be with as little inconvenience and hazard to others legitimately using it as is practicably possible.

[2] ID.—REPAIR OF VEHICLE—TIME—FACT.—Unless upon the face of the testimony it can justly be declared that the time employed in making the repair was reasonable, considering all the conditions and circumstances, and that the manner of the use of the highway for that purpose entailed no unreasonable inconvenience or no such added peril to the traveling public as could not be overcome by the exercise of reasonable care, then the determination of all those matters would be with the jury or the court, where the decision of the questions of fact is committed to the latter.

[3] ID.—COLLISION BETWEEN AUTOMOBILE AND WAGON LEFT STANDING ON HIGHWAY—CORRECTION OF DAMAGE TO WAGON—DILIGENCE.— In this action for damages growing out of a collision by an automobile while being operated by the plaintiff with a large and heavily loaded wagon of the defendants which the latter had left standing on a highway during the night, the trial court was justified under the evidence in finding that defendants were

negligent in that they did not exercise the proper diligence to correct the damage to the wagon so that it could have been removed from the highway.

[4] ID. — RAISING OF DUST BY ANOTHER ·AUTOMOBILE — PLAINTIFF'S VISION OBSCURED—ALLEGED INTERVENING CAUSE.—In such action, where plaintiff's vision of defendants' wagon (which was left standing during the night on the right hand and easterly side of a highway running north and south) was obscured by dust raised by another automobile, which was traveling in a northerly direction and in front of plaintiff, when it turned from the concrete portion to the° dirt part of the highway in order to safely pass defendants' wagon, the stirring up of the dust by the passing of the forward automobile did not constitute an intervening cause, wholly independent of the original or primary act of negligence of defendants, and which so arrested and displaced the primary or original act of negligence as to make it the sole proximate cause of the collision.

[5] ID.—CONTRIBUTORY NEGLIGENCE—EVIDENCE—FINDING—APPEAL.— In such action, where the evidence relating to the alleged contributory negligence of plaintiff presented a question of fact for solution by the trial court, the trial court's finding that plaintiff was not guilty of contributory negligence is conclusive on appeal.

---

(1) 4 C. J., p. 885, n. 42; 29 C. J., p. 649, n. 75. (2) 29 C. J., p. 649, n. 75, p. 668, n. 13. (3) 29 C. J., p. 667, n. 9. (4) 29 C. J., p. 657, n. 35. (5) 4 C. J., p. 885, n. 42; 29 C. J., p. 668, n. 13.

APPEAL from a judgment of the Superior Court of Tulare County. J. A. Allen, Judge. Affirmed.

The facts are stated in the opinion of the court.

Farnsworth, McClure & Burke for Appellants.

Leroy G. Smith for Respondent.

HART, J.—This is an action for damages growing out of a collision by a Ford automobile while being operated by the plaintiff with a large and heavily loaded wagon of the defendants which the latter had left standing on a certain highway in Tulare County. The result of the collision was that the plaintiff's wife, who was riding with him at the time of the collision, was instantly killed, the plaintiff himself sustained physical injuries, and the car driven by him at the time and of which he was the owner was greatly damaged.

The complaint, charging that the collision and the results thereof were proximately caused by the negligence of defendants, is in five counts, or, in other words, sets up five different causes of action, to wit: 1. For injuries to plaintiff's person; 2. For damage to his automobile; 3. For loss of services of his wife; 4. On account of expenses "for sanitarium service and medical aid"; 5. "For undertaker's charges and funeral expenses for his wife." The aggregate amount of damages claimed by plaintiff in his complaint for the several injuries which thus he alleged he received by reason of the collision is the sum of $13,463.15.

The defendants, by their answer, specifically denied each and all the material allegations of the complaint and pleaded contributory negligence, alleging that but for the negligence of the plaintiff the collision and the results thereof would not have occurred.

The court's findings were in general accord with the claims of the complaint, and, agreeably to said findings, judgment passed for the plaintiff for the total sum of $4,728.50. A motion for a new trial, on all the statutory grounds, was made by defendants and denied by the court.

The defendants, prior to and at the time of the happening of the accident, were, as copartners, engaged in the business of contracting for and doing highway construction work. For the purpose of carrying on this work of construction they had equipped themselves with and used a large variety of implements, tools, and other machinery suitable to and necessary for the building of highways. This outfit they moved from point to point, "as they completed one contract and began another." In the month of October, 1921, they had completed one of these highway contracts near the town of Seville, in Tulare County, and on the thirty-first day of said month proceeded to move their equipment from Seville to a certain point in Fresno County. A large part of the equipment, including a "portable blacksmith-shop," was loaded on a wagon, drawn by six mules. Sometime in the afternoon of said thirty-first day of October, this wagon, so loaded and propelled, was traveling in a northerly direction over and upon a recently constructed and completed paved highway in Tulare County, and, on reaching a point approximately one-half mile south of the village of Sultana,

in Tulare County, the rear axle of the wagon broke, thereby causing the right hind wheel to lean inward and to scrape against the side of the wagon so that a groove was cut into the wagon-bed. The wheel, so some of the witnesses said, was thrown in contact with the brake rod, with the result that both hind wheels locked in such manner as to make it impossible to proceed farther with the wagon in that condition. There were two men in the wagon at the time of this accidental breaking of the axle. After an examination of the wagon and thus learning the condition in which the breaking of the axle had left it, the two men in charge of the wagon detached the mules therefrom, placed a lantern reflecting a white light on each of the four corners of the wagon, and then left it, with its load, on the highway, where it remained in that condition until the following morning.

About 10 o'clock of the night of said thirty-first day of October the plaintiff was driving a Ford automobile north on the highway on which the wagon of defendants was left standing. His wife was sitting on his right in the front seat. Preceding his machine a short distance, and going in the same direction, was an automobile driven by one Tabuchi, a Japanese friend of plaintiff. Sitting in the front seat with and on the right-hand side of Tabuchi was one T. Iwasa. Immediately before reaching the spot where the wagon was standing, Tabuchi, having observed the light from a lantern suspended from the rear end of the wagon, turned his car to the left so as to pass around the wagon, and in doing so left the paved portion of the highway a short distance. There was at this and some other points scattered over the concrete portion of the highway some fine dirt, and, so the plaintiff testified, the passing of Tabuchi's car over or along the edge of the concrete pavement to get around the wagon caused a cloud of dust to rise just before plaintiff reached the point where the wagon stood, thereby causing plaintiff's vision to become so obscured that he could not or at least did not see the wagon. Thus the collision occurred, with the result as above explained.

·The above is a general statement of the circumstances under which the accident occurred. The court made these findings:

"That on or about the 31st day of October, 1921, at about four o'clock of said day and at a point on the Public Highway about three-fourth miles south from the town of Sultana, in said County and State, the defendants did carelessly and negligently leave and abandon a wagon with overhanging loaded rack, allowing the said wagon and rack then and there to completely obstruct the easterly half of said highway and extended for about twenty-four (24) inches westerly across the center of said highway, thereby making it necessary for vehicles traveling on said highway to turn off the pavement in passing said wagon and travel in loose soil and dust on and beyond the margin of said pavement. . . .

"Plaintiff was driving upon said highway in a northerly direction following, at reasonable distance, another automobile which preceded him, and was traveling at a reasonable rate in a new Ford Touring Car at about ten o'clock of the evening following the abandonment of said wagon upon said highway; the said wagon was invisible to plaintiff at all times. There was loose dirt or dust on each margin of the pavement and loose dry soil on each side of the pavement, and the travel of vehicles on the highway raised dust into the atmosphere and such dust hid the wagon, and lights thereon from plaintiff and his wife. . . .

"That defendants were guilty of gross negligence in leaving said wagon upon said highway as aforesaid without displaying red lights thereon during the night time.

"With reference to the allegations set out in Defendants' answer, it is found and determined: that defendants did cause to be lighted and hung upon the rear end of said wagon a lantern, and upon the front end of said wagon two lanterns, and that said lanterns on the front were on said wagon and burning at the time of the collision described in the complaint, and one on the rear was burning at said time, but all were white lights and dust prevented plaintiff from seeing the white lights or wagon, and there were no red lights on said wagon.

"That plaintiff was not driving in a careless nor negligent manner, nor at a high or unlawful rate of speed, nor without due regard for the safety and convenience of pedestrians nor other vehicles nor drivers on said highway, and plaintiff

was not guilty of contributory negligence and no negligence of plaintiff contributed to the collision, nor to any injury nor to any damage resulting therefrom;

"That plaintiff was driving his automobile in a careful and prudent manner, but he did not see any lantern displayed on the rear of said wagon, and is not guilty of negligence in his manner of driving nor in approaching the said wagon."

The general contention of the defendants is that the foregoing and consequently all other material findings are not supported by the evidence, the specific points being: 1. That, according to the uncontradicted evidence, the defendants were not guilty of any negligence "either as a matter of law or of fact"; 2. That, conceding for the purposes of the argument, that defendants were primarily negligent in leaving their wagon on the highway as indicated and that the plaintiff was not guilty of contributory negligence, "still a wholly independent and responsible human agency, to wit, the other automobile which raised a cloud of dust and obscured respondent's vision, intervened between the act of appellants in leaving the wagon on the road, and the accident, and such intervening independent human agency was the direct proximate cause of the collision"; 3. "Assuming that appellants were guilty of some negligence in leaving the wagon on the road, still, on the uncontradicted evidence, plaintiff was guilty of such contributory negligence as precludes his recovery."

The plaintiff testified:

"I had an accident in October, 1921, on the highway south of Sultana. I think it was November 1st. The afternoon of the day of the accident the wife of Mr. Harada was ill and we visited her. We first went to the home of Harada and then visited the hospital at Orosi. My wife stayed at Harada's when I went to the hospital. In going to Harada's place we went over the Sultana highway at about three or half past three in the afternoon and when we returned along the Sultana highway it was between nine-thirty or ten o'clock at night. On our return along the highway in my machine was my wife. She was sitting at my right on the front seat. There was another machine the owner of which is now in Japan, but the party that was

riding with him, by the name of Iwasa is here. They were driving ahead of me. The distance between our machines varied at different times but at the time of this accident I think it was about forty or fifty feet ahead of my machine. I saw the machine turn slightly, and then a cloud of dust and my vision was obscured and I do not remember anything after that. The machine ahead of me turned slightly to the left. I made a slight turn in the direction that the other machine turned. Then the dirt arose and I couldn't see him and I do not know what happened afterwards. I had been able to see his machine clearly up to that time. It was directly ahead of me. I did not see any light ahead of that machine in the road nor did I see any object ahead of the other machine as I drove along. I have no recollection what happened to my machine after the cloud of dust arose. I was driving about sixteen or seventeen or eighteen miles an hour. I do not know how fast I was driving at the time when I was struck because I do not remember anything about it. I was following the other machine; we were together. I was not looking at my speedometer but I could judge the speed by the amount of the gasoline that I pressed. I think it was about 5:30 in the morning when I regained consciousness at the hospital in Dinuba. After I regained consciousness I felt a very severe pain in my right shoulder. I remained in the hospital two weeks. . . .

"I went through Sultana the first time I went down there in the afternoon and over the same road where the accident occurred. That road was a new paved highway. There was dirt on the edges of the highway but not much in the middle. When we left Harada's place about nine-thirty that night we were going home. . . .

"We traveled on the highway more than one-half mile before the accident and I had been following behind his car. It was a clear night, there wasn't any fog, but it was dark. We left Harada's house about nine-thirty. As Tabuchi was driving along that road after we left Harada's house and before the accident there was no dust to speak of. I had my lights burning and Tabuchi had his lights burning on his car. As we were going along that road north, before we got to where this accident occurred I could not see the lights on the wagon. I never did see any lights on the wagon. I

could not see them just immediately or just at the instant when my car hit the wagon. Just a little before the accident the dust arose.''

A. E. Russell, a resident of Dinuba, Tulare County, was at the place where the accident occurred early in the morning following the day of its occurrence. He testified:

''I reside at Dinuba in this County. On or about the 31st day of October, 1921, I had occasion to pass along the paved highway south of Sultana driving toward Dinuba. I noticed an obstruction on the highway at the time I passed just south of Sultana. I noticed a wagon setting there in the road which had a rack on it, a fellow was standing there, and an automobile was in the ditch. The wagon was loaded with lumber, a feed rack, boards and junk. It was a big rack and the lumber was sticking out about four feet behind the rack. The rack extended over about two feet on each side of the wheels. The right front wheel I think was right at the edge of the paved highway. The right hand hind wheel was about two feet on the paved highway, it was setting in an angle. The wagon was facing north. We thought the wagon was standing two feet over the middle of the highway, that is the lumber was sticking out of the back end of the wagon, towards the west. It might be two feet over the middle of the highway. There was dirt on the highway, it was a new highway and had not been perfectly cleaned off. The dirt stood about four feet on each side; some places you could get a visible view of the edge of the highway. You could see the tracks of passing vehicles in the dirt in the edge of the highway as they went around the wagon. . . .

''The wagon was facing north and the rear end was out on the highway. There are olive trees and fig trees along the right hand side of the road going north. These trees are set at ten or twelve feet from the edge of the highway. I saw these things between six and seven o'clock in the morning, around about six o'clock, at little after six o'clock.''

Cross-examination: ''The road going south from Sultana had just apparently been recently built and uncovered and the dirt covered over the edges of the highway three or four feet. It was quite dusty driving along there. . . . There were figs or olive trees along the highway and I

would say their branches would come out to eight feet. The trees were seven or eight years old. You could drive your car off the highway and not hit the limbs. . . . I would say that the trees were planted twenty feet apart. . . . I don't know the width of the rack on the wagon. I noticed something wrong with the wagon, the right rear wheel was lopped over and was dragging against the frame of the wagon. It looked like it had been doing that for quite a while, it had cut quite a circle in there by rubbing. I didn't notice whether or not it was caught on the brake. The paved highway there is about sixteen feet."

Redirect: "I would have thought that the wagon could have been moved. I made a special note that there was plenty of room to move the wagon off the highway."

Recross: "The boards on the wagon extended about four feet back of the bed. *I would not consider there was anything extra heavy about it. Two horses would move it easy enough on the highway.* I noticed there were fifth chains there."

C. V. Lamb was traveling over the highway on the night of the accident and shortly thereafter was at the scene thereof. He testified:

"I saw the automobile which was damaged in the collision. It was in the ditch, up quite a ways above the wagon. I could not say how far. It was standing right in the bottom of the ditch with the front wheels up on the west bank. . . . When I first saw the machine a Japanese man was in it. He was in a kind of a stupor. It looked like he had run into that wagon. . . . I went back the next morning about nine o'clock and saw the premises. I saw a wagon on the highway. . . . At the time I was there I did not observe the position of the wagon. I had passed it during the night. We noticed it was setting on the highway. The man that was driving the car had to get off the highway to get by on the west side. . . . Along the highway the edges were covered with dirt."

Cross-examination: "I should think it was a pretty dark night. . . . I had gone north earlier in the evening and passed the wagon when it was dark. Along the edge of the paved highway for about a foot there was dirt on either

side. I observed the night of the accident that other machines caused considerable dust.''

T. Iwasa accompanied plaintiff in the latter's car to the home of Harada, but on the return rode with Tabuchi. He testified:

''I first noticed the noise (of the collision) at the time of the accident. We got off of our machine and went to see what happened and found that Mr. and Mrs. Mitsuda were injured, and we took them to Dinuba. At that time Mrs. Mitsuda was dead. Just before we heard that noise as we approached we saw a wagon ahead of us. The condition of the road was not very good at that point where we avoided the wagon in order to pass it and immediately after we heard this noise. We had to get off the highway in order to pass the wagon. There was very light sand laying on the side and I suppose that is what caused the accident, was going through the sand like that raised a dust, and after we stopped the machine and went back to see what happened to Mitsuda we could not see it very well on account of the dust thrown up. The road was clear as far as the center was concerned but on the side was dust or sand.''

Cross-examination: ''I went down that highway when Mitsuda and I went there (to Harada's) in the afternoon. I noticed at that time in the afternoon that the dirt was covering part of the highway. . . . As we were going north along the road that night I could see the rear light but we noticed it some distance away; I called Tabuchi's attention there was a white light down there. That was about the distance between the telephone poles. . . . He (Tabuchi) commenced turning out about a hundred feet away; it might be a hundred feet after we went off the highway up to the time we went back on it. I know that one side of the machine went off the highway. . . . After we passed the wagon it was dusty back there and one could hardly see the other automobile.''

Leroy G. Smith, attorney for plaintiff, testified as follows:

''I will state at the outset that I was called by a Japanese interpreter very early in the morning, I should judge about half past three o'clock following this accident, and as soon as it was light enough to see, went out to the scene of the accident and went very carefully over the situation. I had

in mind the possibility of adjustment of claims if a claim
should be made, and looking more carefully in detail perhaps,
than another person would under the same circumstances.
I found that the right rear wheel of the wagon had evi-
dently weakened under the heavy load, and the top was
impressed against the frame of the wagon, and had cut
something of a groove where the tire comes in contact with
the frame.   There was nothing else on any one of the four
wheels unless it would be a hot box, which I could not dis-
cover, that would in any way impede the motion of a wheel.
That wheel was not locked or any other member of the
wagon except by the friction of the top of the wheel rubbing
against the wagon.   It struck me as an exceptionally heavy
load to put on a wagon of that kind.   I think it was a
thimble skein wagon.   It was difficult to determine just
where the edges of the highway at that point were, but I
took a stick and scraped off the dirt at both the right front
wheel and the right rear wheel.   The right front wheel was
turned so that it was not parallel with the edge of the high-
way.   A portion of the wheel was touching the edge.   The
tongue being pointed toward and to the right of the high-
way.   The rear wheel leaned inward and the lower part was
nearer the outer edge of the highway than the plumb from
the upper part of the wheel would have been so that the
hub, the middle of the spokes was further in on the highway
than the tire where it came in contact with the highway.
I went to both edges of the highway and scraped off the
dirt so I could locate the extreme edge of the highway.   I
measured from the middle of the highway to a plumb line
from the overhanging left rear corner of the wagon and I
estimated the distance from the center of the highway to
the rear corner of the wagon to be between twenty-two and
twenty-three inches west of the middle of the highway.
There was a well beaten track way made by automobiles
where machines had passed around that wagon.   The dirt
was very loose and it was of a peculiar filmy kind of dirt
that makes a dust.   I was satisfied at the time that there
was a light on the left front of the wagon and it is only
a conclusion in my mind there was a light on the left rear
because of the pieces of a lantern that I saw there. . . .

"The automobile was fifty-seven steps from the point of impact on the wagon, to a place directly opposite the Ford on the highway. The right hand side of the car was practically demolished. The top was torn to shreds and the car bore the appearance of having something ran through the right side of the windshield across the front seat, taking the back with it, and jamming the right rear of the body. There was plenty of room to move that wagon off the highway without coming in contact with the trunks of the trees, and by disturbing the limbs of those trees slightly, the whole load could have been put well over the edge of the highway. Outside of that dragging tire there was nothing that would prevent its being moved. The dirt was soft on that side, it is true, it would have pulled a great deal harder than on the highway. The wagon could have been unloaded and moved very easily; there was nothing bulky on that wagon; that is, I mean to say, while the total load was of tremendous bulk, the pieces upon it could have easily been handled and thrown off to the side of the road or put on to something else. There was no lanterns near or around the right side of the wagon, and no evidence of any having been hung there and there was no evidence of a flag about the wagon of any kind, and I could see no sign of any kind of any warning except the two lanterns that I referred to in the beginning.''

Cross-examination: "The wagon was loaded with cement frames and some other loose stuff, and also lumber. My conception of the load is that it was too large, much heavier and higher than that given by Mr. Russell this morning. There was lots of lumber, these heavy frames they use for pouring cement, I think there must have been at least two feet of that packed in solid, perhaps two and a half or three. I think that about four men could unload it in a couple of hours.''

The witness, Iwasa, called for further cross-examination, stated:

"When I went down that Sultana highway in the afternoon at three o'clock this wagon was standing there.''

Henry Cano, driver of the wagon on the day of the accident, testifying for plaintiff, stated that it was about 5:30 P. M. when he first started to drive on the highway on which the accident occurred.

The above is a comprehensive statement of the testimony presented by the plaintiff. There is a conflict between that testimony and the testimony introduced by the defendants upon many of the essentially vital facts. It was, of course, for the trier of the facts (the court in this instance) to settle that conflict and from the whole mass of testimony determine the ultimate facts, and, unless it appears that upon the whole testimony the decision arrived at is, as a matter of law, erroneous, then that determination is binding upon this court.

The proposition first advanced by the defendants is that the mere act itself of leaving the wagon on the highway under the circumstances as indicated did not constitute negligence on their part. To the contrary, they contend, the provisions of subdivision W of section 20 of the State Vehicle Act (Stats. 1919, p. 219, in force at the time the damage complained of here was sustained) furnishes legal justification for the act of leaving the wagon on the highway. That paragraph of said section provides:

"No person shall leave standing, or cause or permit to be left standing upon the main traveled portion of any public highway, a vehicle undergoing repair, or which has been stopped for the purpose of having repairs made thereon, or for the purpose of camping; provided, however, that this provision shall not apply to a vehicle which shall be disabled, while on such main traveled portion of the highway, in such manner and to such extent that it shall be impossible to avoid stopping such vehicle on said main traveled portion of the highway, and impracticable to remove the same therefrom until repairs shall have been made."

The language of the above provision is very general, but, in its application, it must be given a construction conformable to reason and common sense. If the language of the section were to be accepted without qualification there would be no limit to the time during which the highways of the state might be used for the purpose of repairing a vehicle getting out of order while being driven over such highways. [1] What the section evidently means, or was intended to mean, is that where some essential part of the mechanical contrivances of a vehicle, while being driven over a highway, gets so out of repair as to render it incapable of performing

its work, with the result that such vehicle cannot be moved by the usual method of moving it, then, if it be practicable to remedy the difficulty *within a reasonable time,* the vehicle may be allowed to stand on the highway until the defect or injury is corrected. Moreover, the provision clearly contemplates that the use of the highway for that purpose must be with as little inconvenience and hazard to others legitimately using it as is practicably possible. [3] And, unless upon the face of the testimony it can justly be declared that the time employed in making the repair was reasonable, considering all the conditions and circumstances, and that the manner of the use of the highway for that purpose entailed no unreasonable inconvenience or no such added peril to the traveling public as could not be overcome by the exercise of reasonable care, then the determination of all those matters would be with the jury or the court, where, as here, the decision of the questions of fact is committed to the latter. The evidence in this case is such as to make it peculiarly the province of the trier of the questions of fact to determine whether the defendants acted with due or reasonable diligence and with reasonable convenience and safety to others traveling over the highway in removing the wagon or in repairing the damage thereto so that it could be removed from the situation in which it was allowed to remain standing on the thoroughfare. [3] The court was at liberty to find specifically, as impliedly it did find, these facts: That the wagon, large and heavily loaded with certain materials, which extended over or beyond its bed, was left standing at a slight angle on the highway, the front wheels being on the edge of the right side of the highway and the rear end nearer the center thereof; that the wagon was left standing in that condition and situation between the hours of 3:00 and 4:00 o'clock P. M. of the day of the accident and suffered to remain so standing until the following morning, without any real effort on the part of the defendants either to remove it or to make any earnest attempt to repair the injury to it so that it could be removed; that, notwithstanding the asseverations of the defendants to the contrary, there were facilities or means at hand (the tools constituting the portable blacksmith-shop and the large boards or scantling which were a part of the

equipment on the wagon) with which the brake could have been pried from the wheels and other repairs so made within a comparatively brief space of time as to have enabled them to remove the wagon from the concrete pavement to the dirt portion of the highway, thereby making the paved portion perfectly clear and safe for the usual travel; that, as a matter of fact, the wagon, in the first instance, could have conveniently been turned to and left standing on the dirt portion of the road; that, because of the position in which the wagon was left on the concrete pavement, passing autoists were, to be perfectly safe, compelled to leave the concrete and travel for the required distance over the unpaved portion of the highway to pass the point where the wagon stood; that, finally, and as the sum of all the foregoing considerations, the defendants did not exercise the proper diligence, under the circumstances as shown, to correct the damage to the wagon so that it could have been removed from the highway.

[4] The second point that, even if the act of the defendants in leaving the wagon on the highway as above explained constituted negligence, still the evidence shows that the proximate cause of the collision was due to an intervening independent act of negligence, is devoid of merit. As seen, it is the contention that the stirring up of the dust by the passing of Tabuchi's car to the left of the wagon and on the unpaved portion of the highway, with the result that the air was so impregnated with flying dust as to obscure plaintiff's vision, thereby preventing him from seeing the wagon or the lights suspended therefrom, constituted an intervening cause, wholly independent of the original or primary act of negligence, and which so arrested and displaced the primary or original act of negligence as to make it the sole proximate cause of the collision. But the circumstance of the stirring up of the dust was only a natural incident of the passing of automobiles or other vehicles over the highway. The highway in question was new, having been only recently completed, and over it, near its edges, was scattered fine dirt, not an uncommon way of leaving concrete highways immediately following their completion. Besides, as shown, the position of the wagon on the highway made it safer, if not absolutely necessary, to leave the concrete when passing the wagon and travel on the

dirt portion. Naturally, under these circumstances, passing vehicles would be expected to cause dust to rise and becloud the air, and this condition would only be an essential incident of an act made necessary by the preceding wrongful act of the defendants. In other words, the defendants, by their own act of leaving the wagon on the highway as indicated, created a ,condition which itself was the direct cause of the flying dust and the consequent interruption of the plaintiff's vision so that he was prevented from seeing the wagon. And it was a condition or contingency so natural to arise under the circumstances that the defendants were bound and deemed to anticipate that it would happen.

The situation here with respect to the claim of a sufficient independent cause intervening to arrest or suspend the operation of the original act of negligence, etc., is, in the general aspect thereof, no different from that existing in the cases of *O'Connell* v. *United Railroads,* 19 Cal. App. 36, 64 [124 Pac. 1022], and *Merrill* v. *Los Angeles G. & E. Co.,* 158 Cal. 499, 503 et seq. [139 Am. St. Rep. 134, 31 L. R. A. (N. S.) 559, 111 Pac. 534]. In the O'Connell case the charge of negligence mainly relied upon was that the plaintiff, a youth of about the age of sixteen years, was employed and put to work as a trolley-tender on a work car owned and operated by the defendant. The boy had previously never had experience in such work and the defendant's agents, in charge of the car, failed to warn him, before he entered upon the discharge of the duties of trolley-tender on an electric car, of the danger attending the performance of the duties to which thus he had been assigned. He was directed by the defendant's foreman to reverse the trolley so that the car would take an opposite direction to that in which it had been moving, and, in doing so, the car being still in motion, the trolley was broken, causing him to lose his balance so that he fell to the ground in front of the car, which partly passed over his body, whereby he sustained serious physical injuries. The claim was that the breaking of the trolley and not the failure of defendant's agents to warn the plaintiff of the perils of working in such a position was the proximate cause of the injury. To that contention this court made the following answer, which is of peculiar pertinency to this case as made by the evidence:

"The primary causation here could not, by its very nature, be otherwise than continuous, for it was the very germ from which the ultimate damage developed and without which there would perhaps have been no damage. Its wrongfulness followed, permeated, and inhered in every subsequent act of the plaintiff in discharging his duties as a trolley-tender, and the breaking of the pole was only a necessary ally in the production of the disastrous result which, in all reasonable probability, it was, from its very inception, destined to bring about."

In *Merrill* v. *Los Angeles G. & E. Co., supra,* in which the question in hand is learnedly considered and discussed, it is said: "The original act of negligence, the primary causation, may be in its nature so continuous that the concurrent wrongful act precipitating the disaster will in law be regarded not as independent, but as conjoining with the original act to create the disastrous result."

So here the original act of negligence by the defendants, as found by the court, was in its very nature necessarily continuous, and the stirring up of the dust just before plaintiff's car collided with the wagon merely conjoined "with the original (wrongful) act to create the disastrous result."

[5] The evidence is such that it was entirely with the trial court, as the arbiter of the issues of fact, to solve the question whether the plaintiff was or was not guilty of contributory negligence. There is nothing in the evidence which would justify the declaration, as a matter of law, that the plaintiff did not, under the circumstances, approach the point of collision with reasonable or the due amount of care. He was driving his car at a low rate of speed, not to exceed seventeen miles an hour, and was about fifty feet in the rear of Tabuchi at the time the latter swerved to the left to pass around the wagon and, in doing so, stirred up the dust, thereby obstructing the vision of plaintiff so that he could not see any object on the highway before him; and this turning to the left by Tabuchi and consequent stirring up of the dust was so instantaneous and so near the point where the wagon was standing that it is probably true —in fact, the court could well have specifically so found— that the plaintiff, notwithstanding the low rate of speed at which he was then driving, could not have stopped his car

in time to avoid colliding with or running into the wagon. The plaintiff, as has been shown, testified that, because of the fact that Tabuchi's car was for a long distance in front of him and traveling north on the same side of the highway as he was and on the side on which the wagon was standing, his view ahead of him was so obstructed that he could not and did not at any time before Tabuchi turned to the left see a light or any lights hanging from the wagon or stationed at or near where the wagon stood. But it is further argued that, as Iwasa testified that he saw the wagon on the highway at the point where the collision occurred in the early part of the afternoon of the day of the accident, when he and plaintiff were passing over the highway on their way to the home of Harada, so it must be true that the plaintiff at the same time saw the wagon. There is no direct evidence that the plaintiff saw the wagon at the time referred to, nor is there any evidence that Iwasa at the time or at any time made any remark to the plaintiff with respect to the circumstance of the standing of the wagon on the highway. The court could have concluded, as probably it did, that the plaintiff did not on that occasion see or notice the wagon, or that if he did it made no impression on his mind. But, if it were true that plaintiff did see the wagon at said time and even noticed that it was disabled, still it does not necessarily follow therefrom that he was to assume or suppose that it would be allowed to remain standing on the highway for a period of six or seven hours and in such a position as practically to obstruct the highway and so make it extraordinarily hazardous, particularly in the night-time, to others traveling thereon. Thus briefly have we referred in a general way to the evidence bearing upon the charge that the plaintiff was guilty of negligence which proximately caused or contributed to the accident to confirm the statement substantially above made that the evidence addressed to that issue is such that, as to its effect, reasonable minds could reasonably differ; that, therefore, said evidence presented for the trial court's solution a question of fact, and that, consequently, the finding of the court on that issue is conclusive on this appeal.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.